## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| TIFFANY M. HUGHES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ACCRETIVE HEALTH, INC., MARY A. TOLAN, JOHN T. STATON, JAMES M. BOLOTIN, J. MICHAEL CLINE, EDGAR M. BRONFMAN, JR., STEVEN N. KAPLAN, DENIS J. NAYDEN, GEORGE P. SHULTZ, ARTHUR H. SPIEGEL, III, MARK A. WOLFSON, GOLDMAN, SACHS & CO., CREDIT SUISSE SECURITIES (USA) LLC, J.P. MORGAN SECURITIES INC., MORGAN STANLEY & CO. INC., ROBERT W. BAIRD & CO. INC. and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>Defendants. | CIVIL ACTION NO. 13-cv-3688<br><br>CLASS ACTION COMPLAINT<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff, Tiffany M. Hughes ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Accretive Health, Inc. ("Accretive" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a federal class action on behalf of purchasers of the securities of Accretive, who purchased or otherwise acquired Accretive securities between May 20, 2010 and February

26, 2013, inclusive (the "Class Period"), including purchasers of the Company's securities pursuant or traceable to the Company's initial public offering ("IPO") on or about May 20, 2010 and purchasers of the Company's securities pursuant or traceable to the Company's secondary public offering ("SPO") on or about March 25, 2011, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      According to public filings, Accretive is "a leading provider of services that help healthcare providers generate sustainable improvements in their operating margins and healthcare quality while also enhancing patient, physician and staff satisfaction across our three offerings – revenue cycle management; quality and total cost of care; and physician advisory services."   Relevant to this case, Accretive's revenue cycle management service assists healthcare providers in managing their revenue cycles, encompassing patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation and collections.

3.      Throughout the Class Period, Accretive reported strong financial and operational results to its investors.  For example, the Company reported net service revenues of $606.3 million (a 19% increase from the prior year) and net income of $12.6 million (a 93% increase from the prior year) for fiscal 2010, and net service revenues of $826.3 million (a 36% increase from the prior year), net income of $29.2 million (a 136% increase from the prior year) for fiscal 2011.

4.      The Company also detailed to investors the manner in which it recognized revenue from its managed service contracts, noting that it only recorded revenue "once there is

persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured."

5.     On February 26, 2013, the Company withdrew its financial guidance for fiscal 2012 and disclosed that it was postponing the release of its financial results for the fourth quarter and full year 2012 "because it is evaluating the timing of revenue recognition for its revenue cycle management agreements." Accretive also warned that, if it determined that it had incorrectly recognized revenue for its revenue cycle management agreements, it "may be required to restate prior-period financial statements."

6.     On this news, shares of the Company's stock fell $2.54 per share, or almost 21 percent, to close on February 27, 2013 at $9.57 per share, on unusually heavy trading volume.

7.     On March 8, 2013, Accretive disclosed that it had "concluded that the timing of revenue recognition under certain managed service contracts was incorrect." Although the Company's investigation was continuing as to the full extent of the restatement, Accretive disclosed that it would restate its historical financial statements for fiscal 2010 and 2011, as well as the first three quarterly periods of fiscal year 2012. The Company also cautioned investors that it was "still assessing whether restatement will be required for prior periods. Accordingly, investors should not rely on the Company's financial statements for the years ended December 31, 2009, 2010 and 2011 and the quarterly periods within those years, and for the first three quarterly periods for the year ended December 31, 2012 and any of the Company's other prior financial statements."

8.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had

3

improperly recognized revenue under certain managed service contracts; (2) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

9.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.      Venue is proper in this District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Accretive's principal executive offices are located within this District.

13.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

14.     Plaintiff, Tiffany M. Hughes, as set forth in the accompanying certification, incorporated by reference herein, purchased Accretive securities at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant Accretive is a Delaware corporation with its principal executive offices located at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois.

16.     Defendant Mary A. Tolan ("Tolan") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO") and a member of the Board of Directors.

17.     Defendant John T. Staton ("Staton") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Treasurer.

18.     Defendant James M. Bolotin ("Bolotin") was, at relevant times, the Company's Corporate Controller and Principal Accounting Officer.

19.     Defendant J. Michael Cline ("Cline") was, at all relevant times, the Chairman of the Company's Board of Directors.

20.     Defendant Edgar M. Bronfman, Jr. ("Bronfman") was, at all relevant times, a member of the Company's Board of Directors.

21.     Defendant Steven N. Kaplan ("Kaplan") was, at all relevant times, a member of the Company's Board of Directors.

22.     Defendant Denis J. Nayden ("Nayden") was, at all relevant times, a member of the Company's Board of Directors.

23.     Defendant George P. Shultz ("Schultz") was, at all relevant times, a member of the Company's Board of Directors.

24.     Defendant Arthur H. Spiegel, III ("Spiegel") was, at all relevant times, a member of the Company's Board of Directors.

25.     Defendant Mark A. Wolfson ("Wolfson") was, at all relevant times, a member of the Company's Board of Directors.

26.     Defendants Tolan, Staton, Bolotin, Cline, Bronfman, Kaplan, Nayden, Shultz, Spiegel and Wolfson are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Accretive's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

27.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of the Company's IPO and SPO.

28.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO and SPO.

29.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") was an underwriter of the Company's IPO and SPO.

30.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was an underwriter of the Company's IPO.

31.     Defendant Robert W. Baird & Co. Inc. ("Robert Baird") was an underwriter of the Company's IPO and SPO.

32.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO.

33.     Defendants Goldman Sachs, Credit Suisse, JP Morgan, Morgan Stanley, Robert Baird and William Blair are collectively referred to hereinafter as the "Underwriter Defendants." The Underwriter Defendants served as financial advisors, and assisted in the preparation and dissemination of the offering materials for Accretive's public stock offerings.

## SUBSTANTIVE ALLEGATIONS

### Background

34.     According to public filings, Accretive is "a leading provider of services that help healthcare providers generate sustainable improvements in their operating margins and healthcare quality while also enhancing patient, physician and staff satisfaction across our three offerings – revenue cycle management; quality and total cost of care; and physician advisory services."   Relevant to this case, Accretive's revenue cycle management service assists healthcare providers in efficiently manage their revenue cycles, encompassing patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation and collections.

### Materially False and Misleading
### Statements Issued During the Class Period

35.     The Class Period begins on May 20, 2010.  On this day, Accretive commenced an initial public offering ("IPO") of common stock, selling a total of 11.5 million shares of common

stock for itself and certain "selling stockholders" (including defendants Tolan, Staton and Kaplan). The shares were sold to investors at a price of $12.00 per share, for gross proceeds of over $138 million. Each of the Underwriter Defendants were underwriters of the Company's IPO. In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively, the "IPO Offering Materials"). The IPO Offering Materials were signed by defendants Tolan, Staton, Bolotin, Cline, Bronfman, Kaplan, Nayden, Schultz, Spiegel and Wolfson.

36. The IPO Offering Materials presented, in a highly detailed manner, the Company's financial and operational results for fiscal years 2008 and 2009, and for the first quarter of fiscal 2010 (ended March 31, 2010). For example, the IPO Offering Materials reported that the Company had generated $398.5 million in net services revenues during fiscal 2008, $510.2 million in net services revenues during fiscal 2009, and $125.9 million in net service revenues during the first quarter of fiscal 2010.

37. With respect to how Accretive generated its Net Services Revenue, the IPO Offering Materials stated:

> We derive our net services revenue primarily from service contracts under which we manage our customers' revenue cycle operations. Revenues from managed service contracts consist of base fees and incentive payments:
>
> - Base fee revenues represent our contractually-agreed annual fees for managing and overseeing our customers' revenue cycle operations. Following a comprehensive review of a customer's operations, the customer's base fees are tailored to its specific circumstances and the extent of the customer's operations for which we are assuming operational responsibility; we do not have standardized fee arrangements.
>
> - Incentive payment revenues represent the amounts we receive by increasing our customers' net patient revenue and identifying potential payment sources for patients who are uninsured and underinsured. These payments are governed by specific formulas contained in the managed service contract with each of our customers. In general, we earn incentive payments by increasing a

customer's actual cash yield as a percentage of the contractual amount owed to such customer for the healthcare services provided.

In addition, we earn revenue from other services, which primarily include our share of revenues associated with the collection of dormant patient accounts (more than 365 days old) under some of our service contracts. We also receive revenue from other services provided to customers that are not part of our integrated service offerings, such as procedure-by-procedure fee schedule reviews, physician advisory services or consulting on the billing for individuals receiving emergency room treatment.

38.     With respect to how the Company recognized revenue from its managed service

contracts, the IPO Offering Materials stated:

**Revenue Recognition**

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin 104. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and

private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

39.    The statements made in the IPO Offering Materials, contained in ¶¶ 36 – 38 were materially false and misleading when made because the defendants failed to disclose or indicate the following: (1) that the Company had improperly recognized revenue under certain managed service contracts; (2) that the Company's financial statements were not prepared in accordance with GAAP; (3) that the Company lacked adequate internal and financial controls; (4) that the Company's financial statements were materially false and misleading at all relevant times; and (5) that, as a result of the foregoing, the IPO Offering Materials were materially false and misleading when issued.

40.    On August 12, 2010, Accretive issued a press release announcing its quarterly results for the second quarter of 2010 (ended June 30, 2010).  For the quarter, the Company reported net service revenues of $151.9 million[1], net income of $3.9 million, and diluted earnings per share ("EPS") of $0.04.

---

[1]    According the press release, the components of Accretive's net service revenues are: Net base fees for managed service contracts; Incentive payments for managed service contracts; and "Other services."

41.     On August 13, 2010, Accretive filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on August 12, 2010.

42.     The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Tolan and Staton, which stated:

I, [Mary A. Tolan/ John T. Staton], certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Accretive Health, Inc. (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to

materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*        *        *

In connection with this Quarterly Report on Form 10-Q of Accretive Health, Inc. (the "Company") for the period ended June 30, 2010 (the "Report"), the undersigned, [Mary A. Tolan, Director, Founder, President and Chief Executive Officer/John T. Staton, Chief Financial Officer and Treasurer] of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, that, to her knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

43.    On November 11, 2010, Accretive issued a press release announcing its quarterly results for the third quarter of 2010.  For the quarter, the Company reported net service revenues of $158.4 million, net income of $2.9 million, and diluted earnings per share of $0.03.

44.    On November 12, 1010, Accretive filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on November 11, 2010.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

45.     On March 2, 2011, Accretive issued a press release announcing its quarterly results for the fourth quarter and full year 2010.  For the quarter, the Company reported net service revenues of $170 million, net income of $5.5 million, and diluted earnings per share of $0.06.  For fiscal 2010, the Company reported net service revenues of $606.3 million (a 19% increase from fiscal 2009), net income of $12.6 million (a 93% increase from fiscal 2009), and diluted earnings per share of $0.13.

46.     On March 18, 2011, Accretive filed its Annual Report with the SEC on Form 10-K.  The Company's Form 10-K was signed by defendants Tolan, Staton, Bolotin, Cline, Bronfman, Kaplan, Nayden, Schultz, Spiegel and Wolfson, and reaffirmed the Company's financial results previously announced on March 2, 2011.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

47.     With respect to revenue recognition, the Company's Form 10-K stated:

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin 104. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Some of our service contracts entitle customers to receive a share of the cost savings achieved from operating their revenue cycle. This share is credited to the customers as a reduction in subsequent base fees. Services revenue is reported net of cost sharing and is referred to as net services revenue.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences,

but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, the timing of which is often dependent on factors outside our control and which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

48.     The statements contained in ¶¶ 40 – 47 were materially false and misleading when made because the defendants failed to disclose or indicate the following: (1) that the Company had improperly recognized revenue under certain managed service contracts; (2) that the Company's financial statements were not prepared in accordance with GAAP; (3) that the Company lacked adequate internal and financial controls; and (4) that the Company's financial statements were materially false and misleading at all relevant times.

49.     On or about March 25, 2011, Accretive commenced a secondary public offering ("SPO") of common stock on behalf of certain "selling stockholders" (including defendants Tolan, Staton, Cline and Spiegel). In connection with the SPO, Accretive offered 7.475 million shares of common stock to investors at a price of $23.50 per share, and the selling stockholders received gross proceeds of over $175 million. Defendants Goldman Sachs, Credit Suisse, JP Morgan and Robert Baird were the underwriters of the Company's SPO. In connection with the SPO, the Company filed a Registration Statement and Prospectus (collectively, the "SPO Offering Materials"). The Offering Materials were signed by defendants Tolan, Staton, Bolotin, Cline, Bronfman, Kaplan, Nayden, Schultz, Spiegel and Wolfson.

50.     The SPO Offering Materials presented, in a highly detailed manner, the Company's financial and operational results for fiscal years 2008, 2009 and 2010. For example, the SPO Offering Materials stated that the Company had generated $398.5 million in net services revenues during fiscal 2008, $510.2 million in net services revenues during fiscal 2009, and $606.3 million in net service revenues in fiscal 2010.

51.     With respect to how Accretive generated its Net Services Revenue, the SPO Offering Materials stated:

> We derive our net services revenue primarily from service contracts under which we manage our customers' revenue cycle or quality and total cost of care operations. Revenues from managed service contracts consist of base fees and incentive payments:
>
> • Base fee revenues represent our contractually-agreed annual fees for managing and overseeing our customers' revenue cycle or quality and total cost of care operations. Following a comprehensive review of a customer's operations, the customer's base fees are tailored to its specific circumstances and the extent of the customer's operations for which we are assuming operational responsibility; we do not have standardized fee arrangements.
>
> • Incentive payment revenues for revenue cycle management services represent the amounts we receive by increasing our customers' net patient revenue and identifying potential payment sources for patients who are uninsured and

15

underinsured. These payments are governed by specific formulas contained in the managed service contract with each of our customers. In general, we earn incentive payments by increasing a customer's actual cash yield as a percentage of the contractual amount owed to such customer for the healthcare services provided.

- Incentive payment revenues for quality and total cost of care services will represent our share of the provider community cost savings for our role in providing the technology infrastructure and for managing the care coordination process.

In addition, we earn revenue from other services, which primarily include our share of revenues associated with the collection of dormant patient accounts (more than 365 days old) under some of our service contracts. We also receive revenue from other services provided to customers that are not part of our integrated service offerings, such as procedure-by-procedure fee schedule reviews, physician advisory services or consulting on the billing for individuals receiving emergency room treatment.

52. With respect to how the Company recognized revenue from its managed service contracts, the SPO Offering Materials stated:

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin 104. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Some of our service contracts entitle customers to receive a share of the cost savings achieved from operating their revenue cycle. This share is credited to the customers as a reduction in subsequent base fees. Services revenue is reported net of cost sharing and is referred to as net services revenue.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, the timing of which is often dependent on factors outside our control and which can

16

increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

53.     The statements made in the SPO Offering Materials, contained in ¶¶ 50 – 52 were materially false and misleading when made because the defendants failed to disclose or indicate the following: (1) that the Company had improperly recognized revenue under certain managed service contracts; (2) that the Company's financial statements were not prepared in accordance with GAAP; (3) that the Company lacked adequate internal and financial controls; (4) that the Company's financial statements were materially false and misleading at all relevant times; and (5) that, as a result of the foregoing, the SPO Offering Materials were materially false and misleading when issued.

54.    On May 11, 2011, Accretive issued a press release announcing its quarterly results for the first quarter of 2011.  For the quarter, the Company reported net service revenues of $163.7 million, net income of $0.2 million, and diluted earnings per share of $0.00.

55.    On May 12, 2011, Accretive filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on May 11, 2011.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

56.    On August 10, 2011, Accretive issued a press release announcing its quarterly results for the second quarter of 2011.  For the quarter, the Company reported net service revenues of $183.6 million, net income of $8.6 million, and diluted earnings per share of $0.08.

57.    On August 12, 2011, Accretive filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on August 10, 2011.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

58.    On November 9, 2011, Accretive issued a press release announcing its quarterly results for the third quarter of 2011.  For the quarter, the Company reported net service revenues of $218.9 million, net income of $7.3 million, and diluted earnings per share of $0.07.

59.    On November 10, 2011, Accretive filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on November 9, 2011.  The

Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

60.     On February 29, 2012, Accretive issued a press release announcing its quarterly results for the fourth quarter and full year 2011.  For the quarter, the Company reported net service revenues of $260.1 million, net income of $13.2 million, and diluted earnings per share of $0.13.  For fiscal 2011, the Company reported net service revenues of $826.3 million (a 36% increase from fiscal 2010), net income of $29.2 million (a 136% increase from fiscal 2010), and diluted earnings per share of $0.29.  The press release also stated, in relevant part:

> Based on its strong 2011 contract signings and robust pipeline, Accretive Health expects its PCARR to exceed $1.25 billion at year end, and expects 2012 net services revenue to be in the range of $1.09 billion to $1.12 billion, a year over year increase of 34% at the midpoint of the range, and above the company's long-term growth target of 25% to 30%.
>
> The company expects fiscal year 2012 adjusted EBITDA to be in the range of $114 million to $122 million, which at the midpoint of the range represents a 45% increase over 2011. The adjusted EBITDA range reflects the company's plan to capitalize on superior growth opportunities to enhance its customer value proposition and to invest in strategic areas, such as intra-stay quality and population health management. In addition, the company plans to invest in leading edge technology to enhance its proprietary technology platform and in its centers of excellence through which the company plans to provide professional educational and development content to healthcare providers nationwide. As in prior years, the company anticipates first quarter 2012 EBITDA to be approximately 10% of the full year EBITDA, reflecting both the typical seasonality of incentive revenue as well as the timing of growth investments.
>
> The company expects adjusted diluted earnings per share for fiscal 2012 to be in the range of $0.61 to $0.65, which at the midpoint represents an increase of 43% over 2011.

61.     Also on February 29, 2012, Accretive filed its Annual Report with the SEC on Form 10-K.  The Company's Form 10-K was signed by defendants Tolan, Staton, Bolotin, Cline, Bronfman, Kaplan, Logan, Nayden, Schultz, Spiegel and Wolfson, and reaffirmed the Company's financial results announced that same day.   The Company's Form 10-K also

contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

62.     With respect to revenue recognition, the Company's Form 10-K stated:

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin - Topic 13, *Revenue Recognition*. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Some of our service contracts entitle customers to receive a share of the cost savings achieved from operating their revenue cycle. This share is credited to the customers as a reduction in subsequent base fees. Services revenue is reported net of cost sharing and is referred to as net services revenue.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, the timing of which is often dependent on factors outside our control and which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All

changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

The revenue for the physician advisory services is recognized once each consultation has been completed and is recorded on a per-case basis.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

63.    Additionally, the Form 10-K discussed the adequacy of Accretive's internal control over financial reporting as follows:

Our management, including our Chief Executive and Chief Financial Officers, has conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2011. In conducting this evaluation, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), in Internal Control-Integrated Framework.

Based upon this evaluation and those criteria, management believes that, as of December 31, 2011, Accretive Health's internal control over financial reporting was effective.

64.    On May 9, 2012, Accretive issued a press release announcing its quarterly results for the first quarter of 2012. For the quarter, the Company reported net service revenues of $254 million, net income of $1.5 million, and diluted earnings per share of $0.01.

65.    Also on May 9, 2012, Accretive filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results announced that same day. The Company's Form 10-Q also

contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

66.     On August 8, 2012, Accretive issued a press release announcing its quarterly results for the second quarter of 2012.  For the quarter, the Company reported net service revenues of $236.7 million, net income (loss) of $(0.6 million), and diluted earnings (loss) per share of $(0.01).

67.     On August 9, 2012, Accretive filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on August 8, 2012.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

68.     On November 7, 2012, Accretive issued a press release announcing its quarterly results for the third quarter of 2012.  For the quarter, the Company reported net service revenues of $223.1 million, net income of $2.8 million, and diluted earnings per share of $0.03.

69.     On November 8, 2012, Accretive filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Tolan and Staton, and reaffirmed the Company's financial results previously announced on November 7, 2012.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 42, *supra*.

70.     The statements contained in ¶¶ 54 – 69 were materially false and misleading when made because the defendants failed to disclose or indicate the following: (1) that the Company had improperly recognized revenue under certain managed service contracts; (2) that the Company's financial statements were not prepared in accordance with GAAP; (3) that the

Company lacked adequate internal and financial controls; and (4) that the Company's financial statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

71.     On February 26, 2013, after the close of the market, the Company issued a press release entitled "Accretive Health Postpones Fourth Quarter and Full Year 2012 Earnings Release." Therein, the Company disclosed:

> Accretive Health, Inc. (NYSE: AH), a leading provider of revenue cycle and quality of care services to healthcare providers, today announced that it will postpone the release of its financial results for the fourth quarter and full year 2012, as well as its previously announced investor conference call scheduled for February 27, 2013, because it is evaluating the timing of revenue recognition for its revenue cycle management agreements.

> The Company is currently evaluating the manner in which it recognizes revenue for its revenue cycle management agreements. Based on information available to date, if the Company determines that a change is necessary, the Company may be required to restate prior-period financial statements. The Company believes, based on information available to date, that any such restatement would have no impact on total revenue recognized over the life of a contract or the timing or magnitude of cash flow from operations. This may defer the timing of revenue recognition and may lead to an increase in deferred revenue or other liabilities reported in prior periods.

> The Company expects to delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2012.

> *     *     *

> **Financial Guidance**

> The Company is withdrawing prior financial guidance provided on November 7, 2012 and will announce the revised date for reporting fourth quarter and full year 2012 financial results in a subsequent release.

72.     On this news, shares of the Company's stock fell $2.54 per share, or almost 21 percent, to close on February 27, 2013 at $9.57 per share, on unusually heavy trading volume.

73.     On March 8, 2013, the Company filed a Form 8-K with the SEC disclosing that it would restate its financial statements for the past three years:

On March 4, 2013, the Audit Committee of the Board of Directors of Accretive Health, Inc. (the "Company"), based on the recommendation of management and after consultation with the Company's independent registered public accounting firm, determined that the Company will restate its previously issued financial statements. ***The Company believes, based on information available to date, that it will restate its financial statements for the years ended December 31, 2010 and 2011 and the quarterly periods within these years commencing with the second quarter of 2010, as well as the first three quarterly periods of the year ended December 31, 2012. The Company is still assessing whether restatement will be required for prior periods. Accordingly, investors should not rely on the Company's financial statements for the years ended December 31, 2009, 2010 and 2011 and the quarterly periods within those years, and for the first three quarterly periods for the year ended December 31, 2012*** and any of the Company's other prior financial statements.

***The Company has concluded that the timing of revenue recognition under certain managed service contracts was incorrect.*** Accordingly, the Company will revise its financial statements to correct these errors. The Company believes, based on information available to date, that the restatement will have no impact on total revenue recognized over the life of each managed service contract that is currently in effect and managed service contracts discontinued prior to 2012. The Company is still evaluating the impact, if any, of the restatement on total revenue recognized over the life of managed service contracts that were discontinued in 2012; however, ***the Company believes, based on information available to date, that due to changes in timing of revenue recognition, certain amounts of bad debt expense related to such contracts may instead be accounted for as reduced revenue after restatement***. Furthermore, the Company believes, based on information available to date, that the restatement will (1) have no impact on the timing or magnitude of cash flows from operations, (2) reflect deferred timing of revenue recognition leading to an increase in deferred revenue or other liabilities reported in prior periods, and (3) lead to increases in revenue recognized in future periods.

Although the Company cannot at this time estimate when it will file its restated financial statements and its Annual Report on Form 10-K for the year ended December 31, 2012, it is diligently pursuing completion of the restatement and intends to file the Form 10-K as soon as reasonably practicable. [Emphasis added.]

## ACCRETIVE'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## <u>FILED WITH THE SEC</u>

74. These financial statements and the statements about the Company's financial

results were false and misleading, as such financial information was not prepared in conformity

with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

75.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

76.     The fact that Accretive will restate its financial statements, and disclosed that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

77.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

> (a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);
>
> (b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

78.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Accretive securities during the Class Period (the "Class"), including purchasers of the Company's securities pursuant or traceable to the Company's IPO on or about May 20, 2010 and SPO on or about March 25, 2011. Excluded from the Class are defendants, directors and officers of Accretive and their families and affiliates.

80.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  According to the Company's Form 10-Q filed with the SEC on November 8, 2012, Accretive had over 97 million shares of stock outstanding, owned by thousands of persons.

81.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Securities Act and/or Securities Exchange Act were violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of Accretive securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

82.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

83.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

84.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

85.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.   The price of Accretive's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.   As a result of their purchases of Accretive securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

86. During the Class Period, the defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Accretive's securities during the Class Period.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

87. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased Accretive securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

88. At all relevant times, the market for Accretive securities was efficient for the following reasons, among others: (a) as a regulated issuer, Accretive filed periodic public reports with the SEC; and (b) Accretive regularly communicated with public investors via established

29

market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

89.     Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

90.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Accretive who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM

### Violation of Section 11 of The Securities Act
### Against All Defendants in Connection with the IPO

91.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the IPO Offering Materials.

92.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant to or traceable to the false IPO Offering Materials issued in connection with the Company's May 20, 2010 initial public offering.

93.     This claim is brought within one year after discovery of the untrue statements and omissions in the IPO Offering Materials, and within three years of the effective date of the IPO Offering Materials.

94.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from the defendants and each of them, jointly and severally.

## SECOND CLAIM

### Violation of Section 12(a)(2) of The Securities Act
### Against Accretive and the Underwriter Defendants in Connection with the IPO

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the IPO Offering Materials.

96.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the IPO Offering Materials.

97.     This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## THIRD CLAIM

**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants in Connection with the IPO**

98.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the IPO Offering Materials.

99.     The Individual Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Accretive within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Accretive to engage in the acts described herein.

100.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## FOURTH CLAIM

**Violation of Section 11 of The Securities Act**
**Against Accretive, the Individual Defendants, Goldman Sachs, Credit Suisse,**
**JP Morgan and Robert Baird in Connection with the SPO**

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the SPO Offering Materials.

102.    This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant to or traceable to the false SPO Offering Materials issued in connection with the Company's March 25, 2011 secondary public stock offering.

103.    This claim is brought within one year after discovery of the untrue statements and omissions in the SPO Offering Materials, and within three years of the effective date of the SPO Offering Materials.

104.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from the defendants and each of them, jointly and severally.

## FIFTH CLAIM

### Violation of Section 12(a)(2) of The Securities Act
### Against Accretive, Goldman Sachs, Credit Suisse, JP Morgan,
### and Robert Baird in Connection with the SPO

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the SPO Offering Materials.

106.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the SPO Offering Materials.

107.    This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## SIXTH CLAIM

### Violation of Section 15 of The Securities Act
### Against the Individual Defendants in Connection with the SPO

108.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the SPO Offering Materials.

109.     The Individual Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Accretive within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Accretive to engage in the acts described herein.

110.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## SEVENTH CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Accretive and the Individual Defendants

111.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.     During the Class Period, Accretive and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Accretive securities at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

113.    Accretive and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Accretive securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

## EIGHT CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

114.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    The Individual Defendants acted as controlling persons of Accretive within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

117.    As set forth above, Accretive and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: May 17, 2013                         LASKY & RIFKIND, LTD

                                     /s/ Norman Rifkind
                         _____

                         NORMAN RIFKIND
                         AMELIA S. NEWTON
                         351 West Hubbard, Suite 401
                         Chicago, IL 60654
                         Telephone: (312) 634-0057
                         Facsimile: (312) 634-0059


                         BRODSKY & SMITH, LLC
                         JASON BRODSKY
                         MARC ACKERMAN
                         2 Bala Plaza, Suite 602
                         Bala Cynwyd, PA 19004
                         Telephone: (610) 667-6200
                         Facsimile: (610) 667-9029


                         *Attorneys for Plaintiff*

# Exhibit A

## PLAINTIFF'S CERTIFICATION

I, (Mr/Ms) _Tiffany M. Hughes_ , ("Plaintiff") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in _buying/selling of ~~AH STOCK~~_ of securities during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| ① 9/22/11 | 220 - AH @ $21.60/share | 10/28/11 sold 220-AH @ 25.50/share | |
| ② 3/31/12 | 230 - AH @ $19.60/share | 9/6/12 sold 230-AH @ 13.45/share | |

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _8th_ day of _May_ , 20_13_.

Sign Name: _[signature]_
Print Name: _Tiffany M. Hughes_
Address: _1155 W. Roosevelt Rd, unit 401_
State, Zip Code: _Chicago IL 60608_
County: _COOK_
Country (if not USA):