**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| TIFFANY M. HUGHES, | ) |
| | ) Case No. 13-cv-3688 |
| Plaintiff, | ) |
| | ) Honorable Joan B. Gottschall |
| v. | ) |
| | ) **AMENDED CLASS ACTION** |
| ACCRETIVE HEALTH, INC., MARY A. | ) **COMPLAINT** |
| TOLAN, JOHN T. STATON, AND JAMES M. | ) |
| BOLOTIN, | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendants. | ) |
| _____ | ) |

# TABLE OF CONTENTS

I.      SUMMARY OF CLAIMS.................................................................................. 1

II.     JURISDICTION AND VENUE ...................................................................... 5

III.    PARTIES ......................................................................................................... 5

IV.     SUBSTANTIVE ALLEGATIONS ................................................................. 8

        A.      Accretive's Business.......................................................................... 8

                1.      Health Care Revenue Cycle Operations Management............... 8

                2.      Base Fees and Incentive Fees ................................................. 10

        B.      Accretive's Fraudulent Scheme to Artificially Inflate Revenue.......... 11

                1.      The Company's Restatement of All the Historical Financial
                        Statements that It Issued During Its Entire Existence as a
                        Public Company..................................................................... 11

                2.      The Company's Materially Inflation Base Fees and Incentive Fees ........ 13

V.      DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSSIONS
        DURING THE CLASS PERIOD ................................................................... 20

        A.      Materially False and Misleading Statements and Material Omissions in the
                Company's IPO Registration Statement ............................................. 20

        B.      Materially False or Misleading Statements and Material Omissions in the
                Company's Disclosure of 2Q 2010 Results ......................................... 23

        C.      Materially False or Misleading Statements and Material Omissions in the
                Company's Disclosure of 3Q 2010 Results ......................................... 25

        D.      Materially False or Misleading Statements and Material Omissions in the
                Company's Disclosure of 4Q 2010 and FY 2010 Results .................... 26

        E.      Materially False or Misleading Statements and Material Omissions in the
                Company's SPO Registration Statement .............................................. 28

        F.      Materially False or Misleading Statements and Material Omissions in the
                Company's Disclosure of 1Q 2011 Results ......................................... 31

## TABLE OF CONTENTS
(continued)

G.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 2Q 2011 Results ........................................................... 32

H.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 3Q 2011 Results ........................................................... 33

I.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 4Q 2011 and FY 2011 Results .................................... 34

J.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 1Q 2012 Results ........................................................... 36

K.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 2Q 2012 Results ........................................................... 37

L.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 3Q 2012 Results ........................................................... 38

VI.     THE TRUTH EMERGES:  ACCRETIVE'S RESTATEMENT ANNOUNCEMENT AND SUBSEQUENT DISCLOSURES ........................................................................ 39

VII.    DEFENDANTS' VIOLATIONS OF GAAP RULES IN ACCRETIVE'S FINANCIAL STATEMENTS FILED WITH THE SEC ...................................................................... 43

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 45

IX.     LOSS CAUSATION ........................................................................................................ 48

X.      CLASS ACTION ALLEGATIONS ............................................................................... 50

XI.     APPPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ................................................................................. 51

XII.    NO SAFE HARBOR ...................................................................................................... 53

ii

**TABLE OF CONTENTS**
(continued)

XIII.   COUNTS.................................................................................................................. 54

FIRST COUNT
Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated
Thereunder Against Accretive and the Officer Defendants........................................................... 54

SECOND COUNT
Violation of Section 20(a) of the Exchange Act Against the Individual Defendants................... 57

XIV.   PRAYER FOR RELIEF .................................................................................................. 58

XV.   JURY TRIAL DEMANDED ............................................................................................ 59

Lead Plaintiff Pressure Controls, Inc. ("Plaintiff" or "Pressure Controls"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, its counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Accretive Health, Inc. ("Accretive" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued by and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) investigative interviews with persons having first-hand knowledge of the Company's operations.

## I.   SUMMARY OF CLAIMS

1.      This is a federal class action on behalf of purchasers of the securities of Accretive, who purchased or otherwise acquired Accretive securities between May 20, 2010 and February 26, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Accretive helps healthcare providers manage their revenue cycle operations, which includes patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation, and collections. The Company takes over a healthcare provider's revenue cycle operations and augments them with its own personnel, procedures, and technologies with the goal of improving operating margins by increasing revenue and decreasing costs. On the revenue side, the Company seeks to improve its customers' "net revenue yield," defined as cash collections measured against the contractual amounts due for medical services.

3.      Almost 90% of the Company's overall revenue comes from net services revenue, which in turn consists primarily of base fees and incentive fees. The Company receives base fees

for managing customers' revenue cycle operations, net of any cost savings it shares with those customers. Although base fees represent greater than 80% of quarterly revenue, they account for a much smaller share of operating profit because a significant portion of base fees are simply the reimbursement of the cost of revenue cycle operations. The Company's incentive fees represent its share of the portion of the increase in customers' net revenue yields. Incentive fees account for a much larger share of operating profit because they go straight to the bottom line.

4.       The Company has announced that it will restate its historical financial statements for a period of **nine** quarters, including all quarterly and annual financial statements issued during the Class Period. In other words, the Company has acknowledged that **all** of the financial statements that it filed with the SEC during its **entire** existence as a public company were materially false.

5.       The Company's base fees and incentive fees were highly susceptible to manipulation, and indeed, according to its former employees, the Company charged artificially inflated fees throughout the Class Period. One former high-ranking Accretive employee stated that the Company had a "lack of integrity" in its revenue recognition and billing practices and that these improper practices were prevalent throughout the Company.

6.       The Company fraudulently inflated its base fees by prematurely billing and recognizing revenue on additional lines of service that had not yet been formally agreed upon. Toward the end of fiscal quarters, the Company's senior management would direct its employees to scour emails from customers for any indications of interest in additional services. Before any agreement to add a line of service had been finalized, the Company would estimate the revenue stream for such a line of service and book it as an increase in the base fee.

7.       Incentive fee calculations were very complicated, and the Company used this to its

advantage by intentionally manipulating its customers' net revenue yields to charge inflated incentive fees during the Class Period. Because the Company's inflated incentive fees fell directly to the bottom line, this scheme substantially overstated the Company's reported operating income. According to its former employees, the Company manipulated the calculation of its incentive fees in at least three ways:

a.    Instead of calculating net revenue yields using the metric generally called for in the Company's managed service contracts and as represented in its SEC filings, the Company frequently used an alternative method that was more favorable to the Company, resulting in materially inflated incentive fees.

b.    The Company manipulated the calculation net revenue yields by finding some pretextual basis to exclude from its calculations certain departments or services that typically had lower collection rates, thereby inflating net revenue yield improvements and hence the incentive fees.

c.    The Company improperly billed customers and recognized revenue for a customer's entire calculated net revenue yield increase, regardless of what portion of the increase was attributable to the Company's services.

8.    The Company engaged in the fraudulent practice of charging inflated base fees and incentive fees to its customers, and improperly recognizing revenue on such fees, for the purpose of managing its reported net services revenue and earnings, in violation of generally accepted accounting principles ("GAAP"). From 2Q 2010,[1] the Company's first fiscal quarter after its initial public offering ("IPO"), through 3Q 2012, its last publicly disclosed quarterly results, the

---

[1] Throughout this Complaint, plaintiff uses terms such as "2Q 2010" to refer to specific reporting periods. The numeral in front of the "Q" stands for the quarter, with the last four numerals representing the year. "FY" is the abbreviation for fiscal year.

Company reported ten straight quarters of earnings growth and met the market's consensus earnings per share ("EPS") expectations in eight of ten quarters.

9.     The Company's senior management had nearly total access to the Company's billing and revenue recognition practices. Revenue cycle management services were the Company's core business and highly concentrated. In FY 2010, for example, four customers accounted for 83.8% of total net services revenue; one customer alone accounted for 50.7% of total net services revenue during that year. Given that the Company's core business was so dependent on the fees that it could charge to just four customers, the Company's most senior executives closely monitored the operations and revenue for each Accretive site, including reviewing monthly site review reports and regularly meeting with site management teams. Moreover, the Company's disclosure that it is "reviewing each of [its] revenue cycle contracts" and **"all of [its] contractual activities for the past five years"** strongly indicates pervasive fraudulent conduct that was impossible to hide from the Company's senior executives.

10.     Yet throughout the Class Period, defendants concealed from investors that: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings; (2) its financial statements were not prepared in accordance with GAAP; (3) it lacked adequate internal and financial controls; (4) it was systematically inflating the base and incentive fees that it was charging its customers; and (5) its customers were increasingly disputing its fee calculations.

11.     On the last day of the Class Period, February 26, 2013, the Company issued a press release announcing that it was postponing the releases of its financial results for 4Q 2012 and FY 2012 because it was evaluating the "timing" and "manner" of revenue recognition for its revenue cycle management agreements. The Company further disclosed that it "may be required

to restate prior-period financial statements." During the next trading day on February 27, 2013, the price of the Company's common stock plummeted 21% to a closing price of $9.57, a drop of $2.54 on unusually heavy trading volume. In explaining the Company's stock drop on that day, *The Motley Fool* explained that "**the announcement alone brings yet another cloud of uncertainty over the stock and calls management's credibility into question**."

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Accretive's principal executive offices are located within this District.

15.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## III.    PARTIES

16.    Lead Plaintiff Pressure Controls, as set forth in the amended certification attached as Exhibit 1 to this Complaint,[2] purchased Accretive securities at artificially inflated prices during the Class Period and has been damaged thereby.

---

[2] Due to inadvertent error, certain transactions in Accretive securities were omitted from Pressure Controls's certification filed in support of its motion for appointment as lead plaintiff. Dkt. No. 24. The omitted transactions are immaterial, reducing Pressure Controls's total losses during the Class Period by less than 1%.

17.     Defendant Accretive is a Delaware corporation with its principal executive offices located at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois. During the Class Period, Accretive, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

18.     Defendant Mary A. Tolan ("Tolan") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a member of the Board of Directors. She was replaced as the Company's CEO on April 2, 2013. Tolan participated in the issuance of, signed, and/or certified as accurate the Company's:

- Form S-1/A filed with the SEC on May 19, 2010, and Form 424B4 filed with the SEC on May 20, 2010 ("IPO Offering Materials");
- Form 8-K filed with the SEC on August 12, 2010 ("2Q 2010 Form 8-K"), and Form 10-Q filed with the SEC on August 13, 2010 ("2Q 2010 Form 10-Q");
- Form 8-K filed with the SEC on November 11, 2010 ("3Q 2010 Form 8-K"), and Form 10-Q filed with the SEC on November 12, 2010 ("3Q 2010 Form 10-Q");
- Form 8-K filed with the SEC on March 2, 2011 ("4Q 2010 Form 8-K"), and Form 10-K filed with the SEC on March 18, 2011 ("FY 2010 Form 10-K");
- Form S-1/A filed with the SEC on March 21, 2011, and Form 424B4 filed with the SEC on March 25, 2011 ("SPO Offering Materials");
- Form 8-K filed with the SEC on May 11, 2011 ("1Q 2011 Form 8-K"), and Form 10-Q filed with the SEC on May 12, 2011 ("1Q 2011 Form 10-Q");
- Form 8-K filed with the SEC on August 10, 2011 ("2Q 2011 Form 8-K"), and Form 10-Q filed with the SEC on August 12, 2011 ("2Q 2011 Form 10-Q");
- Form 8-K filed with the SEC on November 9, 2011 ("3Q 2011 Form 8-K"), and Form 10-Q filed with the SEC on November 10, 2011 ("3Q 2011 Form 10-Q");
- Form 8-K filed with the SEC on February 29, 2012 ("4Q 2011 Form 8-K"), and Form 10-K filed with the SEC on February 29, 2012 ("FY 2011 Form 10-K");
- Form 8-K filed with the SEC on May 9, 2012 ("1Q 2012 Form 8-K"), and Form 10-Q filed with the SEC on May 9, 2012 ("1Q 2012 Form 10-Q");
- Form 8-K filed with the SEC on August 8, 2012 ("2Q 2012 Form 8-K"), and Form 10-Q filed with the SEC on August 9, 2012 ("2Q 2012 Form 10-Q"); and
- Form 8-K filed with the SEC on November 7, 2012 ("3Q 2012 Form 8-K"), and Form

10-Q filed with the SEC on November 8, 2012 ("3Q 2012 Form 10-Q"). As alleged herein, these SEC filings contained material misrepresentations and omissions when issued. In addition, throughout the Class Period, Tolan made statements in the Company's earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made.

19.     Defendant John T. Staton ("Staton") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Treasurer. He resigned from the Company on August 26, 2013. Staton participated in the issuance of, signed, and/or certified as accurate the Company's: IPO Offering Materials; 2Q 2010 Form 8-K; 2Q 2010 Form 10-Q; 3Q 2010 Form 8-K; 3Q 2010 Form 10-Q; 4Q 2010 Form 8-K; FY 2010 Form 10-K; SPO Offering Materials; 1Q 2011 Form 8-K; 1Q 2011 Form 10-Q; 2Q 2011 Form 8-K; 2Q 2011 Form 10-Q; 3Q 2011 Form 8-K; 3Q 2011 Form 10-Q; 4Q 2011 Form 8-K; FY 2011 Form 10-K; 1Q 2012 Form 8-K; 1Q 2012 Form 10-Q; 2Q 2012 Form 8-K; 2Q 2012 Form 10-Q; 3Q 2012 Form 8-K; and 3Q 2012 Form 10-Q. As alleged herein, these SEC filings contained material misrepresentations and omissions when issued. In addition, throughout the Class Period, Staton made statements in the Company's earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made.

20.     Defendant James M. Bolotin ("Bolotin") was, at relevant times, the Company's Corporate Controller and Principal Accounting Officer. He resigned from the Company on August 10, 2012. Bolotin participated in the issuance of, signed, and/or certified as accurate the Company's: IPO Offering Materials; 2Q 2010 Form 8-K; 2Q 2010 Form 10-Q; 3Q 2010 Form 8-K; 3Q 2010 Form 10-Q; 4Q 2010 Form 8-K; FY 2010 Form 10-K; SPO Offering Materials; 1Q 2011 Form 8-K; 1Q 2011 Form 10-Q; 2Q 2011 Form 8-K; 2Q 2011 Form 10-Q; 3Q 2011 Form 8-K; 3Q 2011 Form 10-Q; 4Q 2011 Form 8-K; FY 2011 Form 10-K; 1Q 2012 Form 8-K; 1Q

2012 Form 10-Q; 2Q 2012 Form 8-K; 2Q 2012 Form 10-Q; 3Q 2012 Form 8-K; and 3Q 2012 Form 10-Q. As alleged herein, these SEC filings contained material misrepresentations and omissions when issued.

21.    Defendants Tolan and Staton are hereinafter collectively referred to as the "Officer Defendants." Together, the Officer Defendants and defendant Bolotin are hereinafter referred to as the "Individual Defendants."[3]

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Accretive's Business

#### 1.    Health Care Revenue Cycle Operations Management

22.    Accretive helps healthcare providers manage their revenue cycle operations, which includes patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation, and collections. Its customers consist primarily of multi-hospital systems, academic medical centers, and independent ambulatory clinics, along with their affiliated physician practice groups. As of May 3, 2010, just before the start of the Class Period, the Company provided revenue cycle management services to 22 customers representing 59 hospitals and $13.6 billion in annual net patient revenue.

23.    Under its managed service contracts, the Company assumes responsibility for the management and cost of a healthcare provider's revenue cycle operations. This means that the Company bears the cost of its customers' employees that are engaged in revenue cycle activities and managed on-site by the Company and the cost of vendors that provide revenue cycle services to its customers, in addition to bearing the cost of its own personnel and facilities.

---

[3] J. Michael Cline, Edgar M. Bronfman, Jr., Steven N. Kaplan, Denis J. Nayden, George P. Shultz, Arthur H. Spiegel, III, Mark A. Wolfson, Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc., Morgan Stanley & Co. Inc., Robert W. Baird & Co. Inc., and William Blair & Company, L.L.C., named as defendants in the initial complaint (Dkt. No. 1), were voluntarily dismissed from this action. Dkt. Nos. 52 and 53.

24.     The Company takes over a healthcare provider's revenue cycle operations and augments them with its own personnel, procedures, and technologies with the goal of improving operating margins by increasing revenue and decreasing costs. On the revenue side, the Company seeks to improve the "net revenue yield," defined as cash collections measured against the contractual amounts due for medical services. To this end, the Company attempts to capture and collect more revenue from both third-party payors (*e.g.*, insurance companies, Medicare) and patients for medical services rendered. Improvements in charge capture generally result from reducing payment denials by payors and identifying additional items that can be billed to payors based on the actual procedures performed. Typically, improvements in customers' operating margins predominantly come from increasing net revenue yields.

25.     The Company also seeks to increase customers' operating margins by reducing the cost of revenue cycle operations, largely by implementing the Company's own technologies and procedures and outsourcing certain processes to its centralized operating facilities in the United States and India.

26.     During the Class Period, the Company received the vast majority of its overall revenue from a small number of customers, mainly large, multi-hospital systems. For example, in FY 2010, four customers accounted for 83.8% of total net services revenue. Ascension Health alone accounted for 50.7% of total net services revenue during that year. Ascension Health became the Company's founding customer in October 2004, and in exchange for its initial start-up assistance and sales and marketing assistance, the Company issued common stock and granted warrants to Ascension Health. As a result, Ascension Health held at least 5% of the Company's voting shares throughout the Class Period.

27.     With these multi-hospital systems, the Company entered into master services

9

agreements. Then with each hospital within the system, the Company entered into managed service contracts pursuant to the guidelines set forth in the master services agreement. The managed service contract laid out each of the services that the Company would provide along with the applicable fees. If a hospital later wanted the Company to provide additional services, they would execute an addendum to the managed service contract.

### 2.     Base Fees and Incentive Fees

28.     Almost 90% of the Company's overall revenue comes from net services revenue, which in turn consists primarily of base fees and incentive fees. The Company receives base fees for managing customers' revenue cycle operations, net of any cost savings it shares with those customers. During the Class Period, base fees represented 81% to 88% of quarterly revenue, but they accounted for a much smaller share of operating profit because a significant portion of base fees were simply the reimbursement of the cost of revenue cycle operations. The Company's incentive fees represent its share of the portion of the increase in customers' net revenue yields. Incentive fees represented for 12% to 16% of quarterly revenue during the Class Period, but they accounted for a much larger share of operating profit because they went straight to the Company's bottom line.

29.     The base fee was initially calculated based on the amount of money that the customer had previously spent on the revenue cycle operations that the Company was about to take responsibility for managing, after taking inflation into account. The managed service contract allowed the Company to adjust its base fee due to, among other things, changes to the scope of services it was providing.

30.     The incentive fee depended on the improvement of the net revenue yield attributable to the Company's efforts. The Company's contracts generally required that net revenue be measured using the "best possible metric" ("Best Possible"). The Company's

Form 424B4, filed with the SEC on May 20, 2010 ("IPO Prospectus"), described the Best

Possible method:

> Through the use of our proprietary technologies and methodologies, we precisely
> calculate each customer's improvement in net revenue yield. This calculation
> compares the customer's actual cash collections for a given instance of care to the
> maximum potential cash receipts that the customer should have received from the
> instance of care, which we refer to as the best possible net compliant revenue. We
> aggregate these calculations for all instances of care and compare the result to the
> aggregate calculation for the year before we began to provide our services to the
> customer. We receive a share of each customer's improvement in net revenue
> yield.

In measuring improvements in net revenue yields, the Company's methodology purportedly

"exclude[d] the impact of external factors such as changes in reimbursement rates from payors,

the expansion of existing services or addition of new services, volume increases and acquisitions

of hospitals or physician practices, which may impact net revenue but are not considered changes

to net revenue yield."

31.     The Company's managed service contracts allowed it to adjust incentive fees

based on net revenue yield improvements that each customer received throughout the life of the

contract (typically 4 to 5 years). Each quarter the Company calculated its share of the increase in

the cumulative improvements that the customer had received to date and booked that increase as

revenue. As explained in more detail below, any quarterly decrease in cumulative improvements

would not result in a cash refund but rather would be applied to offset future incentive fees.

### B.     Accretive's Fraudulent Scheme to Artificially Inflate Revenue

#### 1.     The Company's Restatement of All Financial Statements that It Issued During Its Entire Existence as a Public Company

32.     On March 8, 2013, the Company filed a Form 8-K disclosing that it would restate

its historical financial statements for a period of **nine quarters**, including its annual financial

statements for FY 2010 and FY 2011 and its quarterly financial statements from 2Q 2010 through

3Q 2012. In other words, the Company acknowledged that **all** of the financial statements that it filed with the SEC during its **entire** existence as a public company were materially false.

33.     In a Form 12b-25 filed on November 13, 2013, the Company disclosed that its restatement investigation had so far "concluded that **the timing of revenue recognition under a significant number of its revenue cycle management agreements was incorrect**." (Emphasis added.) Further, "correcting the timing of revenue recognition will . . . reflect deferred timing of revenue recognition leading to an increase in deferred revenue or other liabilities reported in prior periods . . . [and] increases in revenue recognized in future periods." In other words, the Company prematurely recognized revenue under its managed service contracts, materially overstating revenue during the Class Period by improperly accelerating revenue that should have been reported in future periods.

34.     As alleged below, the Company engaged in a fraudulent scheme to inflate its fees for the purpose of managing quarterly revenue and earnings. Indeed, from 2Q 2010, the Company's first fiscal quarter after its IPO, through 3Q 2012, its last publicly disclosed quarterly results, the Company reported ten straight quarters of earnings growth (as measured by non-GAAP adjusted diluted EPS). During the same period, the Company met the market's consensus EPS expectations in eight of the ten quarters, according to StreetInsider.com. Throughout 2011 and 2012, the Company reported net services revenue growth in every quarter (compared to the same quarter in the prior year).

35.     Moreover, the extraordinary breadth and length of the Company's restatement investigation strongly indicates that its improper revenue recognition practices were widespread. During a conference call with analysts on November 13, 2013, the Company disclosed that it is "reviewing each of [its] revenue cycle contracts" and **"all of [its] contractual activities for the**

**past five years.**" (Emphasis added.) The Company further disclosed that because the restatement investigation was a "very laborious and time-consuming process," it did not expect to complete its restatement until March 19, 2014, more than one year after its initial restatement announcement on February 26, 2013. That the restatement will cover nine quarters also strongly indicates pervasive fraudulent conduct.

### 2. The Company's Materially Inflated Base Fees and Incentive Fees

36. The Company's base fees and incentive fees were highly susceptible to manipulation, and indeed, Accretive charged artificially inflated fees throughout the Class Period. A former high-ranking Accretive employee – referred to as "CW1" – stated that the Company had a "lack of integrity" in its revenue recognition and billing practices and that these improper practices were prevalent throughout the Company. Given that the obligation to restate historical financial statements arises only for material inaccuracies, the Company's restatement announcement on February 26, 2013, is an admission that its fees were materially inflated.

37. CW1 was a Revenue Cycle Operations Senior Manager from January 2007 through February 2012, reporting to the Vice President of Revenue Cycle Operations, who in turn reported to defendant CFO Staton. Responsible for managing all aspects of a hospital's revenue cycle operations, CW1 worked at Accretive hospital sites throughout the Country, including Washington, D.C.; Kansas City, Missouri, and Tuscon, Arizona. CW1 regularly attended site review meetings with defendant Tolan and several other members of senior management. Further, CW1 maintained close professional and personal connections with other Accretive senior managers located throughout the country.

38. The Company fraudulently inflated its base fees by prematurely billing and recognizing revenue on additional lines of service that had not yet been formally agreed upon. Under the Company's managed service contracts, the customer could request additional services

13

to be provided by the Company, resulting in an increase of the base fee once an addendum to the contract had been finalized and executed. According to CW1, toward the end of fiscal quarters, to meet revenue and earnings expectations, defendant Tolan and other members of senior management would direct its employees to scour emails from customers for any indications of interest in additional services. Before any agreement to add a line of service had been finalized (*i.e.*, before any executed addendum to the contract), based solely on an email expressing interest, the Company would estimate the revenue stream for such a line of service and book it as an increase in the base fee.

39.    As for incentive fees, which were based on net revenue yield improvements as measured against Best Possible, CW1 stated that there was little confidence within the Company in the integrity of the calculations. According to CW1, the Best Possible calculations required drilling down to a very precise level of detail, and there were a multitude of continually changing factors, such as insurance coverage and prices, going into the calculation of Best Possible for every instance of care. Yet the Company's contracts generally required it to calculate Best Possible for all of the thousands of individual instances of care given by the healthcare providers that the Company served. Moreover, in calculating improvements of the net revenue yield, the Company was supposed to exclude external factors and quantify only the improvement that could be attributed to the Company's services.

40.    Incentive fee calculations were very complicated, and the Company used this to its advantage by intentionally manipulating its customers' net revenue yields to charge inflated incentive fees during the Class Period. Because the Company's inflated incentive fees fell directly to the bottom line, this scheme substantially overstated the Company's reported operating income. According to its former employees, the Company manipulated the calculation of its

incentive fees in at least three ways.

41.     First, CW1 stated that instead of calculating net revenue yields using the Best Possible metric, as generally called for in the Company's managed service contracts and as represented in its SEC filings, the Company frequently billed customers and recognized revenue based on "estimates" of incentive fees using the "cash-to-gross" method. Cash-to-gross measures cash collections against gross revenue – *i.e.*, the contractual estimate of revenue under the covered plan benefit set by third-party payors. It is a more favorable measurement of the Company's net revenue yield than Best Possible, which measures the maximum potential cash receipts that the customer should have received from the instance of care. According to CW1, over a three-year period, the Company would charge its customers incentive fees based on estimated net revenue yields that were supposedly increasing under the cash-to-gross method. Subsequent Best Possible calculations, however, showed that net revenue yields actually decreased over the three-year period. Thus, substituting the cash-to-gross method had the effect of materially inflating incentive fees.

42.     Second, according to "CW2," who was Accretive's Revenue Cycle Manager in Birmingham, Alabama, from April 2007 through April 2012, the Company overstated net revenue yield improvements, thereby inflating incentive fees, by manipulating which hospital departments and services would be included in the calculations. CW2 stated that if a certain department or service typically had lower collection rates than others, the Company would use some pretext to exclude that department or service from its calculations. For example, the Company might arbitrarily exclude the cardiology department because it would negatively impact net revenue yield but then include a new department that would have an expected positive impact.

43.     Third, according to both CW1 and "CW3," who was Accretive's Cost

Management Manager from April 2006 through May 2010, the Company's incentive fees included 100% of any net revenue yield improvement. In other words, the Company billed customers and recognized revenue for the entire calculated net revenue yield increase, regardless of what portion of the increase was attributable to the Company's services. CW3 stated that the Company did not have customer approval to do that.

44.　　Thus, former employees confirm what the Company has already conceded in its restatement-related disclosures: Net services revenue was materially inflated during the Class Period. CW1 stated that the Company's practice of fraudulently inflating its base and incentive fees far pre-dated its May 2010 IPO. CW1 observed such practices as early as 2007 and believes that they became pervasive sometime in 2009. According to CW1, Roland Funsten, the Company's Vice President of Revenue Cycle Operations and CW1's boss, quit in or around December 2009 in part due to these problems.

45.　　Due to the way in which incentive fees were billed, the Company was initially able to mask its overbilling by charging lower incentive fees in subsequent quarters. As previously stated, each quarter the Company would calculate and record its share of the net revenue yield improvements that the customer had received to date. CW3 stated that when the Company had to mask the overbilling of a customer, it could give back the inflated fee amount by simply calculating a lower incentive fee in a subsequent quarter. Hence, as CW3 put it, future net revenue yield growth would cover up the "givebacks" that the Company had to do. In this way, the Company inflated, and then later deflated, its incentive fees for the purpose of managing its quarterly revenue and earnings.

46.　　When there was an unavoidable quarterly drop in a customer's net revenue yield, the Company would no longer be able to cover up its incentive fee "givebacks." As explained

below, in this circumstance, the giveback would show up as an increase in the Company's deferred revenue.

47.    The complicated and opaque fashion in which fees were calculated helped to initially mask the overbilling from the Company's customers. According to CW1, two to three years into their managed service contracts, customers began to notice that they were not seeing the benefits that they were expecting: After taking into account the fees paid to Accretive, its customers ended up with net revenue yields and revenue cycle operation costs that were similar to what they had before contracting with the Company. Consequently, customers began to dispute the Company's fee calculations and balk at paying what they came to recognize as inflated base fees and incentive fees. CW1 stated that the Company's accounts receivables began to suffer as a result – "collections were poor."

48.    According to CW1, the Company's practice of charging inflated fees became pervasive sometime in 2009, and customers began to object to the Company's fees two to three years into their managed service contracts. Thus, one would expect customers' pushback to strongly manifest itself sometime in 2011. In fact, CW1's timeline is corroborated by the Company's own financial statements. Although investors could not have known this at the time, starting in 4Q 2011, customers' pushback against inflated fees began to have a measurable impact on the Company's financial statements, in the form of deferred revenue, accounts receivable, and bad debt expense. This was due to the fact that when customers disputed base and incentive fees, the Company had to account for the reversal of previously recorded revenue and customers' increasing refusal to pay.

49.    When a customer objected to the Company's inflated fee calculations, or when there was insufficient net revenue yield growth to cover up an incentive fee "giveback,"

adjustments would have been made through deferred revenue. In a letter to the SEC dated November 19, 2009, responding to an SEC comment letter, the Company explained that:

> The Company is not required to refund any gain share payments made by the customers. As the negative gain share amount will be carried forward and adjusted against the increase in gain share revenue in subsequent quarters, the Company records an **adjustment to decrease revenue** during the quarter to reflect the decline in cumulative gain share revenue. Since cash is not paid out by the Company, the decrease in revenue which is recorded results in an **increase to deferred revenue**.

(Emphases added.) In other words, the Company does not give its customers cash refunds. Thus, to the extent there are any "errors" in revenue recognition resulting from inflated billings, they would be "corrected" by executing an accounting entry that decreased (debited) revenue and increased (credited) deferred revenue. The deferred revenue resulting from "errors" – intentional or not – would then be applied against future billings.

50.     Therefore, a sharp increase in deferred revenue is a signal indicating past inflation of revenue, and that is precisely what happened starting in 4Q 2011. Total deferred revenue jumped from $19.2 million in 3Q 2011 to $31.2 million in 4Q 2011, an increase of 62.9%. Total deferred revenue increased even further in 1Q 2012, to $41.0 million, before falling back some to $29.8 million in 2Q 2012 and $26.0 million in 3Q 2012.

51.     Moreover, in 4Q 2011, noncurrent deferred revenue appeared for the first time in the Company's financial statements, in the amount of $7.1 million. Noncurrent means that with respect to certain customers, the past inflating "errors" were so large that it would take several years to apply the deferred revenue credits against future revenue. The level of noncurrent deferred revenue jumped even higher in 2012 – $9.1 million in 1Q 2012, $8.4 million in 2Q 2012, and $7.7 million in 3Q 2012.

52.     Further corroborating CW1's account, customers' increasing refusal to pay manifested itself in the form of significantly higher accounts receivable ("AR") balances with the

18

Company's largest customer, Ascension Health. The Company publicly disclosed its AR balance for Ascension Health (which accounted for 50.7% of total net services revenue in FY 2010) for certain quarters. According to this data, the Ascension Health AR balance rose sharply from $22.1 million in 4Q 2010 to $33.5 million in 4Q 2011, an increase of 51.6%. The AR balance steadily rose throughout 2012, to $36.3 million in 1Q 2012, $39.9 million in 2Q 2012, and then reaching $54.7 million in 3Q 2012. Meanwhile, the Company's days sales outstanding ("DSO") for Ascension Health rose from 26 days in 4Q 2010 to 32 days in 4Q 2011, and it rose to 56 days in 3Q 2012.

53.     The Company's calculation "errors" were sufficiently substantial that when the Company and Ascension Health renewed their master services agreement, the parties put in additional clauses for addressing such errors. A comparison of the old Ascension Health master services agreement (attached to the Form S-1 filed with the SEC on September 29, 2009), which was effective from 2007 through August 2012, with the new master services agreement (attached to the Form 10-Q filed with the SEC on November 8, 2012), which became effective on August 6, 2012, shows the following new clauses:

> The Parties acknowledge that despite doing everything reasonably possible to accurately determine the Historical Base Fee and the Historical Cash Collections it is not uncommon for there to be errors and omissions in calculations of this nature.
>
> *     *     *
>
> In the event that a potential error is identified in the metrics reports, which could have a material impact on the measurement of the scorecard performance for the period, the parties will work to identify the range of impact of the potential error and shall establish a mutually agreed upon plan to review and resolve such potential error.
>
> *     *     *
>
> The invoice shall not include amounts associated with unresolved potential errors identified. . . .

54.     The Company's reported allowance for doubtful accounts ("ADA") and bad debt expense rose sharply as well. The Company's ADA balance jumped from $1.8 million in 3Q 2011 to $3.2 million in 4Q 2011, an increase of 77.8%, and remained at an elevated level throughout 2012 – $3.6 million in 1Q 2012, $6.7 million in 2Q 2012, and $4.7 million in 3Q 2012. Likewise, the Company's bad debt expense leaped from $281,000 in 3Q 2011 to $1.4 million in 4Q 2011, and it reached as high as $3.1 million in 2Q 2012.

55.     As the Company admitted in its Form 12b-25 filed on August 12, 2013, "due to changes in timing of revenue recognition, **certain amounts of bad expense related to [managed service] contracts may instead be accounted for as reduced revenue** after restatement." (Emphasis added.) In other words, the revenue should not have been billed and recognized in the first place, the customer refused to pay, and now the Company must write down its previously recognized revenue.

## V.     DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS DURING THE CLASS PERIOD

56.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

### A.     Materially False or Misleading Statements and Material Omissions in the Company's IPO Registration Statement

57.     The Class Period begins on May 20, 2010. On this day, Accretive completed its IPO of common stock, selling a total of 11.5 million shares of common stock for itself and certain "selling stockholders" (including defendants Tolan and Staton). The shares were sold to investors at a price of $12.00 per share, for gross proceeds of over $138 million. In connection with the IPO, the Company filed the IPO Offering Materials, which were signed by defendants Tolan, Staton, and Bolotin.

58.     The IPO Offering Materials presented, in a highly detailed manner, the Company's

financial and operational results for FY 2008 and 2009, and for 1Q 2010. For example, the IPO

Offering Materials reported that the Company had generated $398.5 million in net services

revenue during FY 2008, $510.2 million in net services revenue during FY 2009, and

$125.9 million in net services revenue during 1Q 2010.

59.     Addressing how Accretive generated its Net Services Revenue, the IPO Offering

Materials stated:

> We derive our net services revenue primarily from service contracts under which
> we manage our customers' revenue cycle operations. Revenues from managed
> service contracts consist of base fees and incentive payments:
>
> - Base fee revenues represent our contractually-agreed annual fees for
>   managing and overseeing our customers' revenue cycle operations.
>   Following a comprehensive review of a customer's operations, the
>   customer's base fees are tailored to its specific circumstances and the
>   extent of the customer's operations for which we are assuming operational
>   responsibility; we do not have standardized fee arrangements.
>
> - Incentive payment revenues represent the amounts we receive by
>   increasing our customers' net patient revenue and identifying potential
>   payment sources for patients who are uninsured and underinsured. These
>   payments are governed by specific formulas contained in the managed
>   service contract with each of our customers. In general, we earn incentive
>   payments by increasing a customer's actual cash yield as a percentage of
>   the contractual amount owed to such customer for the healthcare services
>   provided.
>
> In addition, we earn revenue from other services, which primarily include our
> share of revenues associated with the collection of dormant patient accounts (more
> than 365 days old) under some of our service contracts. We also receive revenue
> from other services provided to customers that are not part of our integrated
> service offerings, such as procedure-by-procedure fee schedule reviews, physician
> advisory services or consulting on the billing for individuals receiving emergency
> room treatment.
>
> Some of our service contracts entitle customers to receive a share of the cost
> savings we achieve from operating their revenue cycle. This share is returned to
> customers as a reduction in subsequent base fees. Our services revenue is reported
> net of cost sharing, and we refer to this as our net services revenue.

60.     Addressing how the Company recognized revenue from its managed service

contracts, the IPO Offering Materials stated:

**Revenue Recognition**

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin 104. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these

collections when each customer's cash application is complete.

61.     The statements made in the IPO Offering Materials, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 1Q 2010; (2) the Company's 1Q 2010 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

**B.     Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 2Q 2010 Results**

62.     On August 12, 2010, Accretive issued a press release (attached to the 2Q 2010 Form 8-K) announcing its quarterly results for 2Q 2010. For the quarter, the Company reported net services revenue of $151.9 million, net income of $3.9 million, and non-GAAP adjusted diluted EPS of $0.07, beating the market's consensus EPS expectation of $0.04.[4] Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

63.     On August 13, 2010, Accretive filed 2Q 2010 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results previously announced on August 12, 2010.

64.     The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Tolan and Staton, which stated:

I, [Mary A. Tolan/ John T. Staton], certify that:

---

[4] All market consensus EPS expectations are from StreetInsider.com.

1. I have reviewed this Quarterly Report on Form 10-Q of Accretive Health, Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

24

In connection with this Quarterly Report on Form 10-Q of Accretive Health, Inc. (the "Company") for the period ended June 30, 2010 (the "Report"), the undersigned, [Mary A. Tolan, Director, Founder, President and Chief Executive Officer/John T. Staton, Chief Financial Officer and Treasurer] of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, that, to her knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

65.    The statements made in disclosing the Company's 2Q 2010 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 2Q 2010; (2) the Company's 2Q 2010 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

### C.    Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 3Q 2010 Results

66.    On November 11, 2010, Accretive issued a press release (attached to the 3Q 2010 Form 8-K) announcing its quarterly results for 3Q 2010. For the quarter, the Company reported net services revenue of $158.4 million, net income of $2.9 million, and non-GAAP adjusted diluted EPS of $0.06, matching the market's consensus EPS expectation. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

67.    On November 12, 1010, Accretive filed the 3Q 2010 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results

25

previously announced on November 11, 2010. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

68.     The statements made in disclosing the Company's 3Q 2010 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 3Q 2010; (2) the Company's 3Q 2010 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

### D.     Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 4Q 2010 and FY 2010 Results

69.     On March 2, 2011, Accretive issued a press release (attached to the 4Q 2010 Form 8-K) announcing its results for 4Q 2010 and FY 2010. For the quarter, the Company reported net services revenue of $170 million, net income of $5.5 million, and non-GAAP adjusted diluted EPS of $0.09, matching the market's consensus EPS expectation. For FY 2010, the Company reported net services revenue of $606.3 million (a 19% increase from FY 2009), net income of $12.6 million (a 93% increase from FY 2009), and non-GAAP adjusted diluted EPS of $0.24. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

70.     On March 18, 2011, Accretive filed its FY 2010 Form 10-K, which was signed by defendants Tolan, Staton, and Bolotin, reaffirming the Company's quarterly and annual financial results previously announced on March 2, 2011. The Company's Form 10-K also contained

Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

71. Addressing revenue recognition, the Company's Form 10-K stated:

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin 104. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Some of our service contracts entitle customers to receive a share of the cost savings achieved from operating their revenue cycle. This share is credited to the customers as a reduction in subsequent base fees. Services revenue is reported net of cost sharing and is referred to as net services revenue.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, the timing of which is often dependent on factors outside our control and which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates

that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

72. The statements made in disclosing the Company's 4Q 2010 and FY 2010 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 4Q 2010 and FY 2010; (2) the Company's 4Q 2010 and FY 2010 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

### E. Materially False or Misleading Statements and Material Omissions in the Company's SPO Registration Statement

73. On or about March 25, 2011, Accretive commenced its secondary public offering ("SPO") of common stock on behalf of certain "selling stockholders" (including defendants Tolan and Staton). Accretive offered 7.475 million shares of common stock to investors at a price of $23.50 per share, and the selling stockholders received gross proceeds of over $175 million. In connection with the SPO, the Company filed the SPO Offering Materials, which were signed by defendants Tolan, Staton, and Bolotin.

74. The SPO Offering Materials presented, in a highly detailed manner, the Company's financial and operational results for FY 2008, 2009, and 2010. For example, the SPO

Offering Materials stated that the Company had generated $398.5 million in net services revenue during FY 2008, $510.2 million in net services revenue during FY 2009, and $606.3 million in net services revenue in FY 2010.

75.     Addressing how Accretive generated its Net Services Revenue, the SPO Offering Materials stated:

> We derive our net services revenue primarily from service contracts under which we manage our customers' revenue cycle or quality and total cost of care operations. Revenues from managed service contracts consist of base fees and incentive payments:
>
>   •   Base fee revenues represent our contractually-agreed annual fees for managing and overseeing our customers' revenue cycle or quality and total cost of care operations. Following a comprehensive review of a customer's operations, the customer's base fees are tailored to its specific circumstances and the extent of the customer's operations for which we are assuming operational responsibility; we do not have standardized fee arrangements.
>
>   •   Incentive payment revenues for revenue cycle management services represent the amounts we receive by increasing our customers' net patient revenue and identifying potential payment sources for patients who are uninsured and underinsured. These payments are governed by specific formulas contained in the managed service contract with each of our customers. In general, we earn incentive payments by increasing a customer's actual cash yield as a percentage of the contractual amount owed to such customer for the healthcare services provided.
>
>   •   Incentive payment revenues for quality and total cost of care services will represent our share of the provider community cost savings for our role in providing the technology infrastructure and for managing the care coordination process.
>
> In addition, we earn revenue from other services, which primarily include our share of revenues associated with the collection of dormant patient accounts (more than 365 days old) under some of our service contracts. We also receive revenue from other services provided to customers that are not part of our integrated service offerings, such as procedure-by-procedure fee schedule reviews, physician advisory services or consulting on the billing for individuals receiving emergency room treatment.

76.     Addressing how the Company recognized revenue from its managed service contracts, the SPO Offering Materials stated:

Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

We record revenue in accordance with the provisions of Staff Accounting Bulletin 104. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Some of our service contracts entitle customers to receive a share of the cost savings achieved from operating their revenue cycle. This share is credited to the customers as a reduction in subsequent base fees. Services revenue is reported net of cost sharing and is referred to as net services revenue.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, the timing of which is often dependent on factors outside our control and which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

77.     The statements made in the SPO Offering Materials, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in FY 2010; (2) the Company's FY 2010 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

### F.     Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 1Q 2011 Results

78.     On May 11, 2011, Accretive issued a press release (attached to the 1Q 2011 Form 8-K) announcing its quarterly results for 1Q 2011. For the quarter, the Company reported net services revenue of $163.7 million, net income of $0.2 million, and non-GAAP adjusted diluted EPS of $0.04, matching the market's consensus EPS expectation. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

79.     On May 12, 2011, Accretive filed its 1Q 2011 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results previously announced on May 11, 2011. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

80.     The statements made in disclosing the Company's 1Q 2011 operating results,

alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 1Q 2011; (2) the Company's 1Q 2011 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

>### G.    Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 2Q 2011 Results

81.    On August 10, 2011, Accretive issued a press release (attached to the 2Q 2011 Form 8-K) announcing its quarterly results for 2Q 2011. For the quarter, the Company reported net services revenue of $183.6 million, net income of $8.6 million, and non-GAAP adjusted diluted EPS of $0.12, beating the market's consensus EPS expectation of $0.10. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

82.    On August 12, 2011, Accretive filed its 2Q 2011 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results previously announced on August 10, 2011. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

83.    The statements made in disclosing the Company's 2Q 2011 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially

32

overstating its reported net services revenue and earnings in 2Q 2011; (2) the Company's 2Q 2011 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

### H. Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 3Q 2011 Results

84.     On November 9, 2011, Accretive issued a press release (attached to the 3Q 2011 Form 8-K) announcing its quarterly results for 3Q 2011. For the quarter, the Company reported net services revenue of $218.9 million, net income of $7.3 million, and non-GAAP adjusted diluted EPS of $0.11, falling a penny short of the market's consensus EPS expectation of $0.12. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

85.     On November 10, 2011, Accretive filed its 3Q 2011 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results previously announced on November 9, 2011. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

86.     The statements made in disclosing the Company's 3Q 2011 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 3Q 2011; (2) the Company's 3Q 2011 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company

failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

I.      **Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 4Q 2011 and FY 2011 Results**

87.     On February 29, 2012, Accretive issued a press release (attached to the 4Q 2011 Form 8-K) announcing its results for 4Q 2011 and FY 2011. For the quarter, the Company reported net services revenue of $260.1 million, net income of $13.2 million, and non-GAAP adjusted diluted EPS of $0.17, beating the market's consensus EPS expectation of $0.16. For FY 2011, the Company reported net services revenue of $826.3 million (a 36% increase from fiscal 2010), net income of $29.2 million (a 136% increase from fiscal 2010), and non-GAAP adjusted diluted EPS of $0.44. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. During the call, defendant Tolad represented that, "we're wanting to make sure that we have **very conservative revenue recognition approaches**." (Emphasis added.)

88.     Also on February 29, 2012, Accretive filed its FY 2011 Form 10-K, which was signed by defendants Tolan, Staton, and Bolotin, reaffirming the Company's quarterly and annual financial results announced that same day. The Company's Form 10-K also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

89.     Addressing revenue recognition, the Company's Form 10-K stated:

> Our managed service contracts generally have an initial term of four to five years and various start and end dates. After the initial terms, these contracts renew annually unless canceled by either party. Revenue from managed service contracts consists of base fees and incentive payments.

> We record revenue in accordance with the provisions of Staff Accounting Bulletin - Topic 13, Revenue Recognition. As a result, we only record revenue once there is persuasive evidence of an arrangement, services have been rendered, the amount of revenue has become fixed or determinable and collectibility is reasonably assured. We recognize base fee revenues on a straight-line basis over the life of the

managed service contract. Base fees for contracts which are received in advance of services delivered are classified as deferred revenue in the consolidated balance sheets until services have been provided.

Some of our service contracts entitle customers to receive a share of the cost savings achieved from operating their revenue cycle. This share is credited to the customers as a reduction in subsequent base fees. Services revenue is reported net of cost sharing and is referred to as net services revenue.

Our managed service contracts generally allow for adjustments to the base fee. Adjustments typically occur at 90, 180 or 360 days after the contract commences, but can also occur at subsequent dates as a result of factors including changes to the scope of operations and internal and external audits. All adjustments, the timing of which is often dependent on factors outside our control and which can increase or decrease revenue and operating margin, are recorded in the period the changes are known and collectibility of any additional fees is reasonably assured. Any such adjustments may cause our quarter-to-quarter results of operations to fluctuate. Adjustments may vary in direction, frequency and magnitude and generally have not materially affected our annual revenue trends, margin trends, and visibility.

We record revenue for incentive payments once the calculation of the incentive payment earned is finalized and collectibility is reasonably assured. We use a proprietary technology and methodology to calculate the amount of benefit each customer receives as a result of our services. Our calculations are based in part on the amount of revenue each customer is entitled to receive from commercial and private insurance carriers, Medicare, Medicaid and patients. Because the laws, regulations, instructions, payor contracts and rule interpretations governing how our customers receive payments from these parties are complex and change frequently, estimates of a customer's prior period benefits could change. All changes in estimates are recorded when new information is available and calculations are completed.

Incentive payments are based on the benefits a customer has received throughout the life of the managed service contract with us. Each quarter, we record the increase in the total benefits received to date. If a quarterly calculation indicates that the cumulative benefits to date have decreased, we record a reduction in revenue. If the decrease in revenue exceeds the amount previously paid by the customer, the excess is recorded as deferred revenue.

The revenue for the physician advisory services is recognized once each consultation has been completed and is recorded on a per-case basis.

Our services also include collection of dormant patient accounts receivable that have aged 365 days or more directly from individual patients. We share all cash generated from these collections with our customers in accordance with specified arrangements. We record as revenue our portion of the cash received from these collections when each customer's cash application is complete.

90.    Additionally, the Form 10-K discussed the adequacy of Accretive's internal

control over financial reporting as follows:

> Our management, including our Chief Executive and Chief Financial Officers, has conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2011. In conducting this evaluation, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), in Internal Control-Integrated Framework.

> Based upon this evaluation and those criteria, management believes that, as of December 31, 2011, Accretive Health's internal control over financial reporting was effective.

91.     The statements made in disclosing the Company's 4Q 2011 and FY 2011 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 4Q 2011 and FY 2011; (2) the Company's 4Q 2011 and FY 2011 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers; and (5) the Company failed to disclose that its customers were increasingly disputing its fee calculations.

**J.      Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 1Q 2012 Results**

92.     On May 9, 2012, Accretive issued a press release (attached to the 1Q 2012 Form 8-K) announcing its quarterly results for 1Q 2012. For the quarter, the Company reported net services revenue of $254 million, net income of $1.5 million, and non-GAAP adjusted diluted EPS of $0.06, matching the market's consensus EPS expectation. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

93.     Also on May 9, 2012, Accretive filed its 1Q 2012 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results announced that same day. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

94.     The statements made in disclosing the Company's 1Q 2012 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 1Q 2012; (2) the Company's 1Q 2012 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers; and (5) the Company failed to disclose that its customers were increasingly disputing its fee calculations.

**K.     Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 2Q 2012 Results**

95.     On August 8, 2012, Accretive issued a press release (attached to the 2Q 2012 Form 8-K) announcing its quarterly results for 2Q 2012. For the quarter, the Company reported net services revenue of $236.7 million, net income loss of -$0.6 million, and non-GAAP adjusted diluted EPS of $0.03, falling short of the market's consensus EPS expectation of $0.08. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

96.     On August 9, 2012, Accretive filed its 2Q 2012 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results previously

announced on August 8, 2012. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

97.     The statements made in disclosing the Company's 2Q 2012 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 2Q 2012; (2) the Company's 2Q 2012 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers; and (5) the Company failed to disclose that its customers were increasingly disputing its fee calculations.

**L.     Materially False or Misleading Statements and Material Omissions in the Company's Disclosure of 3Q 2012 Results**

98.     On November 7, 2012, Accretive issued a press release (attached to the 3Q 2012 Form 8-K) announcing its quarterly results for 3Q 2012. For the quarter, the Company reported net services revenue of $223.1 million, net income of $2.8 million, and non-GAAP adjusted diluted EPS of $0.06, beating the market's consensus EPS expectation of $0.05. Also on that day, defendants Tolan and Staton held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release.

99.     On November 8, 2012, Accretive filed its 3Q 2012 Form 10-Q, which was signed by defendants Tolan and Staton, reaffirming the Company's quarterly financial results previously announced on November 7, 2012. The Company's Form 10-Q also contained Sarbanes-Oxley certifications substantially similar to the certifications contained in ¶64, *supra*.

100.    The statements made in disclosing the Company's 3Q 2012 operating results, alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in 3Q 2012; (2) the Company's 3Q 2012 financial statements were not prepared in accordance with GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers; and (5) the Company failed to disclose that its customers were increasingly disputing its fee calculations.

## VI.    THE TRUTH EMERGES: ACCRETIVE'S RESTATEMENT ANNOUNCEMENT AND SUBSEQUENT DISCLOSURES

101.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

102.    On February 26, 2013, after the close of the market, the Company issued a press release titled "Accretive Health Postpones Fourth Quarter and Full Year 2012 Earnings Release." Therein, the Company disclosed:

> Accretive Health, Inc. (NYSE: AH), a leading provider of revenue cycle and quality of care services to healthcare providers, today announced that it will postpone the release of its financial results for the fourth quarter and full year 2012, as well as its previously announced investor conference call scheduled for February 27, 2013, because it is evaluating the timing of revenue recognition for its revenue cycle management agreements.

> The Company is currently evaluating the manner in which it recognizes revenue for its revenue cycle management agreements. Based on information available to date, if the Company determines that a change is necessary, the Company may be required to restate prior-period financial statements. The Company believes, based on information available to date, that any such restatement would have no impact on total revenue recognized over the life of a contract or the timing or magnitude of cash flow from operations. This may defer the timing of revenue recognition

and may lead to an increase in deferred revenue or other liabilities reported in prior periods.

The Company expects to delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2012.

*　　*　　*

**Financial Guidance**

The Company is withdrawing prior financial guidance provided on November 7, 2012 and will announce the revised date for reporting fourth quarter and full year 2012 financial results in a subsequent release.

103.　　Following this disclosure, on February 27, 2013, Oppenheimer & Company Inc.

("Oppenheimer") issued an analyst report stating:

> Accretive Health announced that 4Q12 results, which were supposed to be released this morning, will be delayed due to a review of revenue recognition of the company's revenue cycle management contracts. We believe there are two primary estimates being made by the company in determining revenue recognition: 1) incentive fee measurement; and 2) base fee reductions associated with shared services. However, the determination of cost reductions is relatively predictable in our estimation. Therefore, **we believe the most likely scenario is that Accretive's auditors are requiring the company to establish a contra revenue account**.

(Emphasis added.)

104.　　On this news, shares of the Company's stock fell $2.54 per share, or almost 21%,

to close on February 27, 2013 at $9.57 per share, on unusually heavy trading volume.

105.　　On March 8, 2013, the Company filed a Form 8-K with the SEC disclosing that it

would restate its financial statements for the past three years:

> On March 4, 2013, the Audit Committee of the Board of Directors of Accretive Health, Inc. (the "Company"), based on the recommendation of management and after consultation with the Company's independent registered public accounting firm, determined that the Company will restate its previously issued financial statements. **The Company believes, based on information available to date, that it will restate its financial statements for the years ended December 31, 2010 and 2011 and the quarterly periods within these years commencing with the second quarter of 2010, as well as the first three quarterly periods of the year ended December 31, 2012. The Company is still assessing whether restatement will be required for prior periods. Accordingly, investors should not rely on the Company's financial statements for the years ended December 31, 2009, 2010 and 2011 and the quarterly periods within those years, and for**

40

**the first three quarterly periods for the year ended December 31, 2012 and any of the Company's other prior financial statements.**

**The Company has concluded that the timing of revenue recognition under certain managed service contracts was incorrect.** Accordingly, the Company will revise its financial statements to correct these errors. The Company believes, based on information available to date, that the restatement will have no impact on total revenue recognized over the life of each managed service contract that is currently in effect and managed service contracts discontinued prior to 2012. The Company is still evaluating the impact, if any, of the restatement on total revenue recognized over the life of managed service contracts that were discontinued in 2012; however, **the Company believes, based on information available to date, that due to changes in timing of revenue recognition, certain amounts of bad debt expense related to such contracts may instead be accounted for as reduced revenue after restatement.** Furthermore, the Company believes, based on information available to date, that the restatement will (1) have no impact on the timing or magnitude of cash flows from operations, (2) reflect deferred timing of revenue recognition leading to an increase in deferred revenue or other liabilities reported in prior periods, and (3) lead to increases in revenue recognized in future periods.

Although the Company cannot at this time estimate when it will file its restated financial statements and its Annual Report on Form 10-K for the year ended December 31, 2012, it is diligently pursuing completion of the restatement and intends to file the Form 10-K as soon as reasonably practicable.

(Emphases added.)

106.    On November 13, 2013, the Company filed a Form 8-K and Form 12b-25, each of which provided an update on the Company's restatement process. A press release attached to the Form 8-K stated that the Company "expect[ed] to complete its restatement process and file restated financial statements with the SEC by March 19, 2014." The Form 12b-25 disclosed certain findings made in connection with the Company's restatement investigation:

**The Company has concluded that the timing of revenue recognition under a significant number of its revenue cycle management agreements was incorrect.** Accordingly, the Company will revise its financial statements to correct these errors. The Company believes, based on information available to date, that correcting the timing of revenue recognition will (1) have no impact on the timing and magnitude of cash flows from operations, (2) **reflect deferred timing of revenue recognition leading to an increase in deferred revenue or other liabilities reported in prior periods,** and (3) result in increases in revenue recognized in future periods. Furthermore, the Company believes, based on information available to date, that **due to changes in timing of revenue**

recognition, **certain amounts of bad debt expense related to its revenue cycle management agreements may instead be accounted for as reduced revenue after restatement**.

Moreover, **the Company has determined that a significant portion of the base fee revenues from its revenue cycle management agreements should have been presented in the Company's previously reported financial statements net of associated operating costs rather than based on the gross amount of base fees billed to customers**. Accordingly, the Company will revise its financial statements to correct this error. This change in financial statement presentation is not expected to impact either net income or the timing and magnitude of cash flows from operations in any reporting period.

(Emphases added.)

107.    Also on November 13, the Company held a conference call with analysts. Among the participants were the Company's new President and CEO, Stephen F. Schuckenbrock, and its new CFO, Sean F. Orr. During the call, Schuckenbrock and Orr reiterated the disclosures made in the Company's SEC filings on that day.

108.    Following the Company's restatement announcement on February 26, 2013, some analysts speculated that the restatement may be localized, limited to certain former customers in Minnesota that had terminated their relationships with the Company. During the November 13 call, Orr disclosed that the Company's accounting violations were widespread: "At this time, **we are reviewing each of our revenue cycle contracts**. Please understand that this is a very laborious and time-consuming process, which **requires us to review all of our contractual activities for the past five years** to ascertain the proper netting of costs and deferrals of revenue, and this is what is driving the extended schedule, and it is a significant effort." (Emphases added.)

109.    Also during the November 13 call, Schuckenbrock stated: "Our measurement model; we have a unique and comprehensive method of measuring the results we generate for our clients, but this methodology is complex. **We are in the process of simplifying it, which will make doing business with us easier**." (Emphasis added.) Later on in the call, discussing the

modified measurement model, he added: "[W]e do expect it to be a lot easier to do business with our customers and **helping our customers with transparency around our results and their results**. . . ." (Emphasis added.) This disclosure is consistent with allegations that the complex and subjective nature of calculating incentive fees (and certain base fees components) allowed the Company to both overcharge customers and inflate revenues, at least until customers discovered billing "errors."

## VII. DEFENDANTS' VIOLATIONS OF GAAP RULES IN ACCRETIVE'S FINANCIAL STATEMENTS FILED WITH THE SEC

110.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

111.    Accretive's financial statements and statements about the Company's financial results were materially false or misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting of and disclosure about its revenue, in violation of GAAP rules.

112.    The fact that Accretive will restate its financial statements and disclosed that its financial statements issued during the Class Period should not be relied upon is an admission that they were false and misleading when originally issued (Accounting Principles Board Opinion No. 20 at ¶¶7-13; Financial Accounting Standards Board Statement No. 154 at ¶25).

113.    Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to

rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. ASC 105-10-05-1.

114.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

115.    The SEC prohibits the management of earnings. On September 28, 1998, in response to growing concerns about registrants' managing earnings to achieve earnings estimates, then-SEC Chairman Arthur Levitt gave a speech titled "The Numbers Game." One earnings management gimmick that SEC Chairman Levitt addressed in his speech was abusive revenue recognition practices. In response to Chairman Levitt's comments regarding abusive earnings management, the SEC issued two staff accounting bulletins relevant to this case to address earnings management problems: Staff Accounting Bulletin No. 99 ("SAB 99"); and Staff Accounting Bulletin No. 101, Topic 13, *Revenue Recognition* ("SAB 101, Topic 13").

116.    SAB 99 provides that misstatements of a financial statement item for the purpose of managing earnings to mask a change in earnings or other trends or to hide a failure to meet analysts' consensus expectations for the enterprise are material under GAAP. "It is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as a part of an ongoing effort directed by or known to senior

management for the purposes of 'managing' earnings." SAB 99.

117.     SAB 101, Topic 13, provides that revenue generally is realized or realizable and earned when all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.

118.     ASC Topic 605-10, *Revenue Recognition* ("ASC 605-10"), provides that revenues are not recognized until realized or realizable and earned.

119.     Further, each registrant with securities registered pursuant to Section 12 of the Exchange Act must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

120.     For the reasons set forth in Section IV.B., *supra*, due to the Company's fraudulent practice of charging inflated base fees and incentive fees to its customers, and its improper recognition of revenue on such fees, for the purpose of managing its reported net services revenue and earnings, its publicly disclosed financial statements during the Class Period were prepared in violation of GAAP rules SAB 99; SAB 101, Topic 13; and ASC 605-10.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

121.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

122.     The Officer Defendants, by virtue of their receipt of information reflecting the improper and fraudulent conduct described above and/or their failure to review information they had a duty to monitor, their actual issuance of materially false or misleading statements or their

control over such statements, and their associations with Accretive and each other, which made them privy to confidential proprietary information concerning the Company, were active, culpable, and primary participants in the fraudulent scheme alleged herein. The Officer Defendants knew or with deliberate recklessness disregarded the materially false or misleading nature of the information they caused to be disseminated to the investing public.

123.    The Officer Defendants also knew or with deliberate recklessness disregarded that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Officer Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members.

124.    In addition to the foregoing allegations, the following facts support a strong inference that Accretive and the Officer Defendants knew or with deliberate recklessness disregarded that the challenged statements alleged herein were materially false or misleading when made.

125.    Revenue cycle management services are the Company's core business, and it derives the vast majority of its overall revenue from base fees and incentive fees. Moreover, during the Class Period, just four customers accounted for the vast majority of the Company's overall revenue. In FY 2010, for example, these four customers accounted for 83.8% of total net services revenue. Ascension Health alone accounted for 50.7% of total net services revenue during that year.

126.    Given that Accretive's core business was so dependent on the base and incentive fees that it could charge to four customers, the Company's most senior executives, including CEO

Tolan and CFO Staton, closely monitored operational performance and revenue. As the Company's IPO Prospectus states:

> **On a monthly basis, our chief executive officer, chief financial officer and other senior leaders monitor our overall net patient revenue under management, aggregate net services revenue**, revenue cycle operating costs, corporate-level operating expenses, cash flow and adjusted EBITDA. . . . **Our senior operational leaders also monitor the performance of each customer's revenue cycle operations through ten to twelve hospital-specific operating reviews each year.** Such reviews typically focus on planned and actual revenue cycle operating results being achieved on behalf of our customers, progress against our operating metrics and planned and actual operating costs for that site. **During these regular reviews, our senior operational leaders communicate to the operating teams suggestions to improve contract and operations performance** and monitor the results of previous efforts.

(Emphases added.)

127. CW1 stated that each month, the managers for each Accretive site prepared a site review report for the senior management at the corporate office. The site review report provided the site's cost reductions, revenue enhancements, and net revenue yield metrics. In addition, the management team for each site regularly traveled to the Company's Chicago headquarters for a site review meeting, which were attended by, among others, CEO Tolan and the Senior Vice President and co-head of Revenue Cycle Operations. Thus, defendant Tolan was regularly in direct communication with managers such as Roland Funsten, the Vice President of Revenue Cycle Operations and CW1's boss, who quit in or around December 2009 in part due to the Company's improper billing practices. CW1 also stated that defendant Tolan would constantly call site leaders and demand that they find more revenue to meet the Company's revenue target for the quarter.

128. The Officer Defendants' knowledge or recklessness is also evidenced by each their separations from the Company in the period surrounding the revelation of the Company's fraud. First, defendant Bolotin resigned as the Company's Corporate Controller and Principal

Accounting Officer on August 10, 2012. Second, defendant Tolan was replaced as the Company's CEO on April 2, 2013, a mere 35 days after the Company's restatement announcement on February 26, 2013. Third, defendant Staton soon followed Tolan, resigning as the Company's CFO on August 26, 2013. The separations of the Company's CEO and the most senior members of its finance team – by firing and resignation – support a strong inference of scienter.

## IX.    LOSS CAUSATION

129.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

130.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class. During the Class Period, Plaintiff and Class members purchased Accretive securities at artificially inflated prices caused by Defendants' misconduct as alleged herein. The price of the Company's securities declined significantly when the material risks concealed by Defendants materialized and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

131.    Before the last day of the Class Period on February 26, 2013, investors had been unaware of the following material facts about Accretive that had been known to Defendants throughout the Class Period: (1) it had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings; (2) its financial statements were not prepared in accordance with GAAP; (3) it lacked adequate internal and financial controls; (4) it was systematically inflating the base and incentive fees that it was charging its customers; and (5) its customers were increasingly disputing its fee calculations.

132.    On February 26, 2013, the Company issued a press release announcing that it was postponing the releases of its financial results for 4Q 2012 and FY 2012 because it was evaluating

the "timing" and "manner" of revenue recognition for its revenue cycle management agreements. The Company further disclosed that it "may be required to restate prior-period financial statements." Subsequently, on March 8, 2013, the Company issued a Form 8-K confirming that it would restate its financial statements from 2Q 2010 through 3Q 2012 and that such financial statements could no longer be relied on.

133.    Based on the February 26 disclosures, Oppenheimer issued an analyst report on February 27, 2013, stating: "We believe there are two primary estimates being made by the company in determining revenue recognition: 1) incentive fee measurement; and 2) base fee reductions associated with shared services. However, the determination of cost reductions is relatively predictable in our estimation. Therefore, we believe **the most likely scenario is that Accretive's auditors are requiring the company to establish a contra revenue account**." (Emphasis added.)

134.    In reaction to the February 26 disclosures, during the next trading day on February 27, 2013, the market drove down the value of Accretive's shares. On that day, the price of the Company's common stock plummeted 21% to a closing price of $9.57, a drop of $2.54 on unusually heavy trading volume.

135.    In a posting to its website on February 27, *The Motley Fool* explained the Company's stock drop on that day: "Accretive said that it is reviewing the way it recognizes revenue under its revenue cycle management agreements, triggering serious investor concern that it may have to restate earnings for previous periods. While the company said the any such restatement shouldn't impact total revenue recognized over the life of a contract, **the announcement alone brings yet another cloud of uncertainty over the stock and calls management's credibility into question**." (Emphasis added.)

## X.    CLASS ACTION ALLEGATIONS

136.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

137.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Accretive securities during the Class Period (the "Class"), seeking to pursue remedies under the Exchange Act. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

138.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Accretive securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Accretive shares were traded publicly during the Class Period on NYSE. According to the Company's Form 10-Q filed with the SEC on November 8, 2012, Accretive had over 97 million shares of stock outstanding, owned by thousands of persons. Record owners and other members of the Class may be identified from records maintained by Accretive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

139.    Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein. Further, Plaintiff will fairly and adequately protect the interests of Class

members and has retained counsel competent and experienced in class and securities litigation.

140.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' conduct alleged herein;

        b.    whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of the Company; and

        c.    to what extent Class members have sustained damages and the proper measure of damages.

141.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

142.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

143.    The market for Accretive securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's

securities relying on the integrity of the market price of such securities and on publicly available market information relating to Accretive; Plaintiff and Class members have been damaged thereby.

144.    During the Class Period, the artificial inflation of the value of Accretive securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

145.    At all relevant times, the market for Accretive securities was efficient for the following reasons, among others:

        a.      Accretive's stock met the requirements for listing, and it was listed and actively traded on NYSE, a highly efficient and automated market.

        b.      As a regulated issuer, Accretive filed periodic public reports with the SEC and/or the NYSE.

        c.      Accretive regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

d.    Accretive was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

146.    Based on the foregoing, during the Class Period, the market for Accretive securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of the Company's stock. Under these circumstances, the market for Accretive securities was efficient during the Class Period; therefore, investors' purchases of Accretive securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

147.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts that concealed the Company's inflated revenue.

## XII.    NO SAFE HARBOR

148.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

149.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense

statements when made.

150.    To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XIII.  COUNTS

**FIRST COUNT**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Accretive and the Officer Defendants**

151.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against Accretive and the Officer Defendants.

152.    During the Class Period, Accretive and the Officer Defendants: (i) knowingly or with deliberate recklessness deceived the investing public, including Plaintiff and Class members, as alleged herein; (ii) artificially inflated the market price of Accretive securities; and (iii) caused Plaintiff and Class members to purchase or otherwise acquire Accretive securities at artificially inflated prices.

153.    Accretive and each of the Officer Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make their statements not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of Accretive securities during the Class Period.

154.    As a result of their making and/or substantially participating in the creation of

affirmative statements to the investing public, Accretive and the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

155.    As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, traded on NYSE, and governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

156.    Accretive and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation and/or dissemination of, false or misleading statements of material fact as set forth herein, or with deliberate recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them. Accretive and the Officer Defendants carried out a deliberate scheme to misrepresent and conceal the Company's revenue, trends having a material impact on its revenue, and its regulatory risks.

157.    The facts alleged herein give rise to a strong inference that Accretive and each of the Officer Defendants acted with scienter. Each of them knew or with deliberate recklessness disregarded that the Class Period statements alleged herein contained material misrepresentations and omissions for the reasons set forth herein.

158.    By virtue of the Officer Defendants' positions of management and control within

Accretive, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects. The Officer Defendants would ascertain such information through the Company's internal corporate documents; conversations and connections with each other and corporate officers and employees; attendance at sales, management, and Board of Directors' meetings, including committees thereof; and reports and other information provided to them in connection with their roles and duties as Accretive officers and/or directors.

159.    The Officer Defendants were aware of or with deliberate recklessness disregarded that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements, in violation of the federal securities laws.

160.    As a result of Accretive and the Officer Defendants' dissemination of the materially false or misleading information and their failure to disclose material facts, as alleged herein, the market price of Accretive securities was artificially inflated throughout the Class Period. Unaware that the market price of Accretive securities was artificially inflated; relying directly or indirectly on the false or misleading statements made by Defendants at the times such statements were made, or relying upon the integrity of the markets in which Accretive securities traded; and in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by Accretive and the Officer Defendants but not disclosed to the public, Plaintiff and Class members purchased or otherwise acquired Accretive securities at artificially inflated prices.

161.    Had Plaintiff and the other Class members known the truth regarding the problems that Accretive was experiencing, which were not disclosed by the Company and the Officer Defendants, Plaintiff and other Class members would not have purchased or otherwise acquired

Accretive securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

162.    As a direct and proximate result of Accretive and the Officer Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Accretive securities during the Class Period, when the artificial inflation in the price of such securities dissipated as the truth regarding Accretive and the Officer Defendants' conduct was revealed, causing the price of Accretive securities to decline, resulting in economic losses to Plaintiff and the Class.

163.    By reason of the foregoing, Accretive and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in Accretive securities during the Class Period.

**SECOND COUNT**
**Violation of Section 20(a) of the**
**<u>Exchange Act Against the Individual Defendants</u>**

164.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against the Individual Defendants.

165.    Accretive is a primary violator of Section 10(b) and Rule 10b-5, promulgated thereunder.

166.    The Individual Defendants acted as controlling persons of Accretive within the meaning of Section 20(a) of the Exchange Act. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence, and during the Class Period did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein. The Individual Defendants prepared, or were responsible for preparing, the

57

Company's press releases and SEC filings, and they made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls. The Individual Defendants controlled Accretive and each of its employees.

167.    The Individual Defendants were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to contain material misrepresentations and omissions prior to or shortly after their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the Company's public reports and releases.

168.    By virtue of their positions as controlling persons of Accretive, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling a primary violator of the federal securities laws. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

      (d)     Such other and further relief as the Court may deem just and proper.

## XV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 2, 2013            GLANCY BINKOW & GOLDBERG LLP

By: *s/ Joshua Crowell*
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Joshua Crowell
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel*

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
Patrick V. Dahlstrom
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20TH Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com

*Liaison Counsel*

THE YOUNG LAW FIRM
Henry J. Young
347 Bridge St., Suite 201
Phoenixville, PA 19460
Telephone: (610) 933-4440
Email: hjy@theyounglf.com

*Additional Counsel*

EXHIBIT 1

# SWORN CERTIFICATION OF PLAINTIFF
## ACCRETIVE HEALTH, INC. SECURITIES LITIGATION

I, Paul Emmarco, on Behalf of Pressure Controls, Inc. ("Pressure Controls"), certify that:

1. I am fully authorized to enter into and execute this certification on behalf of Pressure Controls. I have reviewed the Amended Complaint against Accretive Health, Inc. alleging violations of federal securities laws and authorized its filing.

2. Pressure Controls did not purchase Accretive Health, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under federal securities laws.

3. Pressure Controls is willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. Pressure Controls' transactions in Accretive Health, Inc. securities during the Class Period set forth in the Amended Complaint are as follows:

   SEE ATTACHED TRANSACTIONS

5. Pressure Controls has not served as a representative party on behalf of a class under the federal securities laws during the last three years.

6. Pressure Controls will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 11/27/13

_____
Paul Emmarco, on behalf of Pressure Controls, Inc.

Title: PRESIDENT

Plaintiff's Transactions in Accretive Health, Inc.

| Date | Quantity | Price | Transaction Type |
|------|----------|-------|------------------|
| 8/19/2011 | 10,000 | $30.0000 | Buy Common Stock |
| 8/19/2011 | 2,500 | $25.0040 | Buy Common Stock |
| 8/25/2011 | 100 | $26.0789 | Buy Common Stock |
| 8/25/2011 | 400 | $26.0799 | Buy Common Stock |
| 9/16/2011 | 1,100 | $25.0000 | Buy Common Stock |
| 9/16/2011 | 1,200 | $25.0083 | Buy Common Stock |
| 11/18/2011 | 11,100 | $25.0007 | Buy Common Stock |
| 11/18/2011 | 2,400 | $30.0007 | Buy Common Stock |
| 11/21/2011 | 10,000 | $25.0000 | Buy Common Stock |
| 1/10/2012 | 1,100 | $25.7100 | Sell Common Stock |
| 1/10/2012 | 700 | $25.7300 | Sell Common Stock |
| 1/10/2012 | 200 | $25.7300 | Sell Common Stock |
| 1/10/2012 | 1,100 | $25.6700 | Sell Common Stock |
| 1/10/2012 | 900 | $25.7300 | Sell Common Stock |
| 1/11/2012 | 900 | $26.0200 | Sell Common Stock |
| 1/11/2012 | 900 | $26.0000 | Sell Common Stock |
| 1/11/2012 | 900 | $26.0000 | Sell Common Stock |
| 1/11/2012 | 300 | $26.4400 | Sell Common Stock |
| 1/11/2012 | 600 | $26.6100 | Sell Common Stock |
| 1/11/2012 | 800 | $26.6100 | Sell Common Stock |
| 1/11/2012 | 800 | $26.6100 | Sell Common Stock |
| 1/11/2012 | 800 | $26.6200 | Sell Common Stock |
| 1/11/2012 | 300 | $26.8870 | Sell Common Stock |
| 1/11/2012 | 100 | $26.8870 | Sell Common Stock |
| 1/11/2012 | 400 | $26.8871 | Sell Common Stock |
| 1/11/2012 | 400 | $26.8884 | Sell Common Stock |
| 1/11/2012 | 100 | $26.8885 | Sell Common Stock |
| 1/11/2012 | 400 | $26.8885 | Sell Common Stock |
| 1/13/2012 | 300 | $26.2584 | Sell Common Stock |
| 1/13/2012 | 200 | $26.2634 | Sell Common Stock |
| 1/13/2012 | 400 | $26.2584 | Sell Common Stock |
| 1/13/2012 | 200 | $26.2670 | Sell Common Stock |
| 1/13/2012 | 300 | $26.2670 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2771 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2771 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2771 | Sell Common Stock |
| 1/13/2012 | 94 | $26.2783 | Sell Common Stock |
| 1/13/2012 | 106 | $26.2785 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2784 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2784 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2785 | Sell Common Stock |
| 1/13/2012 | 300 | $26.2785 | Sell Common Stock |
| 1/13/2012 | 100 | $26.2785 | Sell Common Stock |
| 1/13/2012 | 200 | $26.2784 | Sell Common Stock |
| 1/13/2012 | 300 | $26.2785 | Sell Common Stock |
| 1/13/2012 | 400 | $26.2785 | Sell Common Stock |
| 1/13/2012 | 190 | $26.2671 | Sell Common Stock |
| 1/13/2012 | 600 | $26.2671 | Sell Common Stock |
| 1/13/2012 | 10 | $26.2680 | Sell Common Stock |

| Date | Quantity | Price | Transaction Type |
|---|---|---|---|
| 1/13/2012 | 68 | $26.2584 | Sell Common Stock |
| 1/13/2012 | 232 | $26.2584 | Sell Common Stock |
| **Date** | **Quantity** | **Price** | **Transaction Type** |
| 1/13/2012 | 100 | $26.2585 | Sell Common Stock |
| 1/13/2012 | 400 | $26.2585 | Sell Common Stock |
| 1/13/2012 | 32 | $26.2588 | Sell Common Stock |
| 1/13/2012 | 68 | $26.2585 | Sell Common Stock |
| 1/17/2012 | 100 | $26.5085 | Sell Common Stock |
| 1/17/2012 | 100 | $26.5085 | Sell Common Stock |
| 1/17/2012 | 100 | $26.5085 | Sell Common Stock |
| 1/17/2012 | 100 | $26.5185 | Sell Common Stock |
| 1/17/2012 | 100 | $26.5083 | Sell Common Stock |
| 1/17/2012 | 400 | $26.5084 | Sell Common Stock |
| 1/18/2012 | 100 | $26.5783 | Sell Common Stock |
| 1/18/2012 | 300 | $26.5784 | Sell Common Stock |
| 1/18/2012 | 100 | $26.5785 | Sell Common Stock |
| 1/18/2012 | 400 | $26.5785 | Sell Common Stock |
| 2/17/2012 | 15,000 | $25.0000 | Buy Common Stock |
| 3/16/2012 | 10,000 | $25.0000 | Buy Common Stock |
| 4/11/2012 | 300 | $25.0000 | Buy Common Stock |
| 4/20/2012 | 10,000 | $25.0000 | Buy Common Stock |
| 5/2/2012 | 2 | $8.8700 | Sell Common Stock |
| 5/2/2012 | 25 | $8.8708 | Sell Common Stock |
| 5/2/2012 | 25 | $8.8708 | Sell Common Stock |
| 5/2/2012 | 31 | $8.8706 | Sell Common Stock |
| 5/2/2012 | 69 | $8.8707 | Sell Common Stock |
| 5/2/2012 | 25 | $8.8708 | Sell Common Stock |
| 5/2/2012 | 75 | $8.8707 | Sell Common Stock |
| 5/2/2012 | 100 | $8.8532 | Sell Common Stock |
| 5/2/2012 | 100 | $8.8532 | Sell Common Stock |
| 5/2/2012 | 100 | $8.8532 | Sell Common Stock |
| 5/2/2012 | 100 | $8.8532 | Sell Common Stock |
| 5/2/2012 | 100 | $8.8532 | Sell Common Stock |
| 5/2/2012 | 100 | $8.8531 | Sell Common Stock |
| 5/2/2012 | 48 | $8.9313 | Sell Common Stock |
| 5/2/2012 | 33 | $8.9312 | Sell Common Stock |
| 5/2/2012 | 25 | $8.9312 | Sell Common Stock |
| 5/2/2012 | 25 | $8.9312 | Sell Common Stock |
| 5/2/2012 | 94 | $8.9309 | Sell Common Stock |
| 5/2/2012 | 200 | $8.8899 | Sell Common Stock |
| 5/2/2012 | 800 | $8.8899 | Sell Common Stock |
| 5/2/2012 | 400 | $8.9308 | Sell Common Stock |
| 5/2/2012 | 200 | $8.9308 | Sell Common Stock |
| 5/2/2012 | 100 | $8.9307 | Sell Common Stock |
| 5/2/2012 | 175 | $8.9307 | Sell Common Stock |
| 5/2/2012 | 1,100 | $9.1407 | Sell Common Stock |
| 5/2/2012 | 300 | $9.0608 | Sell Common Stock |
| 5/2/2012 | 100 | $9.0608 | Sell Common Stock |
| 5/2/2012 | 84 | $9.0608 | Sell Common Stock |
| 5/2/2012 | 200 | $9.0608 | Sell Common Stock |
| 5/2/2012 | 416 | $9.0607 | Sell Common Stock |
| 5/2/2012 | 200 | $8.8708 | Sell Common Stock |
| 5/2/2012 | 200 | $8.8708 | Sell Common Stock |
| 5/2/2012 | 900 | $8.8787 | Sell Common Stock |

| Date | Quantity | Price | Transaction Type | | |
|------|----------|-------|------------------|---|---|
| 5/2/2012 | 400 | $8.8707 | Sell Common Stock | | |
| 5/2/2012 | 48 | $8.8706 | Sell Common Stock | | |
| 11/2/2011 | 57 | $0.6000 | SellCallOptWrtr | AH111119C30 | |
| 11/3/2011 | 42 | $0.8000 | SellCallOptWrtr | AH111119C30 | |
| 11/3/2011 | 3 | $2.9000 | SellCallOptWrtr | AH111119C25 | |
| 11/3/2011 | 9 | $2.9000 | SellCallOptWrtr | AH111119C25 | |
| 4/25/2012 | 100 | $0.0500 | BuyCallOptHldr | AH120616C20 | |
| 8/2/2012 | 26 | $1.4500 | SellPutOptWrtr | AH110820P30 | |
| 8/2/2011 | 74 | $1.5500 | SellPutOptWrtr | AH110820P30 | |
| 8/31/2011 | 100 | $0.7000 | SellPutOptWrtr | AH110917P25 | |
| 11/3/2011 | 200 | $0.6500 | SellPutOptWrtr | AH111119P22.5 | |
| 11/30/2011 | 100 | $0.4500 | SellPutOptWrtr | AH111217P20 | |
| 2/3/2012 | 150 | $0.1500 | SellPutOptWrtr | AH120218P25 | |
| 2/29/2012 | 24 | $0.3900 | SellPutOptWrtr | AH120317P25 | |
| 2/29/2012 | 26 | $0.3800 | SellPutOptWrtr | AH120317P25 | |
| 2/29/2012 | 50 | $0.4900 | SellPutOptWrtr | AH120317P25 | |
| 3/15/2012 | 100 | $1.7500 | SellPutOptWrtr | AH120421P25 | |
| 8/31/2011 | 16 | $0.4888 | Sell Open | Exp 9/17/11 @ 25.0000 | Put 100 |
| 8/31/2011 | 20 | $0.4888 | Sell Open | Exp 9/17/11 @ 25.0000 | Put 100 |
| 8/31/2011 | 20 | $0.4888 | Sell Open | Exp 9/17/11 @ 25.0000 | Put 100 |
| 8/31/2011 | 20 | $0.4888 | Sell Open | Exp 9/17/11 @ 25.0000 | Put 100 |
| 8/31/2011 | 24 | $0.4888 | Sell Open | Exp 9/17/11 @ 25.0000 | Put 100 |
| 8/11/2011 | 71 | $0.3388 | Sell Open | Exp 8/20/11 @ 25.00 | Put 100 |
| 8/11/2011 | 25 | $0.3388 | Sell Open | Exp 8/20/11 @ 25.00 | Put 100 |
| 8/11/2011 | 4 | $0.3387 | Sell Open | Exp 8/20/11 @ 25.00 | Put 100 |
| 10/28/2011 | 10 | $2.0815 | Sell Open | Exp 11-19-11 @25.000 | Call 100 |
| 10/28/2011 | 2 | $2.0814 | Sell Open | Exp 11-19-11 @25.000 | Call 100 |
| 11/3/2011 | 12 | $2.9814 | Sell Open | Exp 11-19-11 @25.000 | Call 100 |
| 11/3/2011 | 40 | $0.5388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/3/2011 | 60 | $0.5388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 11 | $0.3388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 10 | $0.3388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 11 | $0.3388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 10 | $0.3388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 20 | $0.3388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 31 | $0.3388 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/8/2011 | 7 | $0.3387 | Sell Open | Exp 11-19-11@ 22.5000 | Put 100 |
| 11/3/2011 | 11 | $1.2315 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 1 | $1.2315 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 10 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 2 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 7 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 11 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 11 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 10 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 20 | $1.0387 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 9 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 4 | $1.0388 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/3/2011 | 15 | $1.0387 | Sell Open | Exp 11-19-11@25.00 | Put 100 |
| 11/8/2011 | 24 | $2.8356 | Sell Open | Exp 11-19-11 @30.000 | Put 100 |
| 2/2/2012 | 7 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 6 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 11 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |

| Date | Quantity | Price | Transaction Type | | |
|------|----------|-------|------------------|---|---|
| 2/2/2012 | 6 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 3 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 6 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 9 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 8 | $0.2381 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/2/2012 | 4 | $0.2380 | Sell Open | Exp 2-18-12 @30.000 | Call 100 |
| 2/28/2012 | 1 | $1.6382 | Sell Open | Exp 3-17-12 @ 25.000 | Call 100 |
| 2/28/2012 | 1 | $1.6382 | Sell Open | Exp 3-17-12 @ 25.000 | Call 100 |
| 2/28/2012 | 11 | $1.6381 | Sell Open | Exp 3-17-12 @ 25.000 | Call 100 |
| 2/28/2012 | 1 | $1.6382 | Sell Open | Exp 3-17-12 @ 25.000 | Call 100 |
| 2/28/2012 | 46 | $1.6381 | Sell Open | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 1 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 10 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 20 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 10 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 12 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 7 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 1 | $0.2118 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 10 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 10 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 12 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |
| 3/13/2012 | 7 | $0.2119 | Buy Close | Exp 3-17-12 @ 25.000 | Call 100 |