# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TIFFANY M. HUGHES, individually and  )
on behalf of all others similarly situated,  )
  )
      Plaintiff,  )
  )    Case No. 13 CV 3688
     v.  )
  )    Judge Joan B. Gottschall
ACCRETIVE HEALTH, INC., MARY A.  )
TOLAN, JOHN T. STATON, and JAMES  )
M. BOLOTIN,  )
  )
      Defendants.  )

## MEMORANDUM ORDER & OPINION

Accretive Health, Inc. is a Delaware corporation that offers revenue-cycle management service to healthcare providers. Lead plaintiff Pressure Controls, Inc. alleges securities fraud against Accretive and three former executives (CEO Mary Tolan, CFO John Staton, and Controller James Bolotin) under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j); SEC Rule 10b-5, 17 C.F.R. 240.10b-5; and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Specifically, Pressure Controls alleges that Accretive made material misrepresentations and omissions regarding its revenue and earnings, revenue recognition policies and practices, and certifications attesting to financial statements and internal controls.

Now before the court is the defendants' motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons discussed below, the motion is granted.

## I. BACKGROUND

The court accepts all well-pleaded allegations in the amended complaint as true for purposes of the motion to dismiss. *See, e.g.*, *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

## A.    Accretive's Operations

Accretive is a publicly traded corporation that helps healthcare providers manage their revenue cycle operations, including patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation, and collections.  As of May 3, 2010, Accretive provided revenue cycle management service to 22 customers representing 59 hospitals and $13.6 billion in annual net patient revenue.  Accretive's initial public offering took place in May 2010.

Most of Accretive's revenue comes from a small number of customers, especially large, multi-hospital systems.  Accretive entered into master services agreements with these systems and managed service contracts with each hospital within the system.  The contracts laid out the services that Accretive would provide, along with the applicable fees.  If a hospital wanted Accretive to provide additional services, the parties would execute an addendum to the managed service contract.

Almost 90% of Accretive's revenue comes from net services revenue, consisting primarily of base fees and incentive fees.  Base fees come from managing customers' revenue-cycle operations.  The managed service contracts allowed Accretive to adjust its base fee due to changes in the scope of services that it provided.  Incentive fees depended on the improvement of net revenue yield attributable to Accretive's efforts.  Generally, Accretive's contracts with its clients required that net revenue be measured using the "best possible metric" as described in Accretive's prospectus:

> Through the use of our proprietary technologies and methodologies, we precisely calculate each customer's improvement in net revenue yield. This calculation compares the customer's actual cash collections for a given instance of care to the maximum potential cash receipts that the customer should have received from the instance of care, which we refer to as the best possible net compliant revenue.  We aggregate these

calculations for all instances of care and compare the result to the aggregate calculation for the year before we began to provide our services to the customer. We receive a share of each customer's improvement in net revenue yield.

(Am. Compl. ¶ 30, ECF No. 54.) The managed service contracts allowed Accretive to adjust incentive fees based on net revenue yield improvements that each customer received throughout the life of the contract. Although base fees represent over 80% of quarterly revenue, they account for a smaller share of operating profit because a large portion of those revenues are reimbursements for the costs of revenue-cycle operations.

From the second quarter of 2010 (the first quarter after Accretive's initial public offering) through the third quarter of 2012, Accretive reported ten straight quarters of earnings growth as measured by non-GAAP adjusted diluted earnings per share. During the same period, Accretive met the market's consensus earnings per share expectations in eight of the ten quarters. Accretive reported net services revenue year-on-year growth for every quarter in 2011 and 2012.

**B.      Disclosures**

On March 8, 2013, Accretive filed a Form 8-K with the Securities & Exchange Commission disclosing that it would restate its historical financial statements for a period of nine quarters, from the second quarter of 2010 through the third quarter of 2012. On November 13, 2013, the Company stated that its restatement investigation had "concluded that the timing of revenue recognition under a significant number of its revenue cycle management agreements was incorrect" and that "correcting the timing of revenue recognition will . . . reflect deferred timing of revenue recognition leading to an increase in deferred revenue or other liabilities reported in prior periods . . . [and] increases in revenue in future periods." (Am. Compl. ¶ 33, ECF No. 54.) In an investor call on the same day, Accretive disclosed that it was reviewing its contractual activities for the previous five years.

## C.     Alleged Misstatements

Pressure Controls alleges that Accretive charged artificially inflated fees throughout the class period based on statements made by three confidential witnesses.

### 1.     Confidential Witness 1

Confidential Witness 1 (CW1) was a Revenue Cycle Operations Senior Manager from January 2007 through February 2012.   CW1 worked at Accretive hospital sites throughout the country and was responsible for managing all aspects of a hospital's revenue-cycle operations. CW1 regularly attended site review meetings with Accretive CEO Tolan and several other members of senior management, and maintained professional and personal connections with other Accretive senior managers throughout the country.

According to CW1, Tolan and other members of Accretive's senior management would direct its employees to review e-mails from customers for any indications of interest in additional services toward the end of fiscal quarters.  Accretive would then estimate the revenue stream for such a line of service and book it as an increase in the base fee before any agreement to add the service had been finalized.

 CW1 stated that there was little confidence in the integrity of the calculations Accretive used to calculate incentive fees.  According to CW1, the calculations required drilling down to a very precise level of data and were very complicated.  CW1 stated that Accretive used this fact to its advantage by intentionally manipulating its customers' net revenue yields to charge inflated incentive fees, thereby overstating Accretive's reported operating income.  Instead of calculating net revenue yields using the Best Possible metric, Accretive frequently billed customers and recognized revenues based on estimates of incentive fees using the "cash-to-gross" method.  That

method measures cash collections against gross revenue and represents a more favorable measurement of Accretive's net revenue yield than the Best Possible metric would.

According to CW1, Accretive charged its customers incentive fees over a three-year period based on estimated net revenue yields that were supposedly increasing under the cash-to-gross method. But subsequent calculations under the Best Possible metric showed that net revenue yields actually decreased during that period.

CW1 stated that Accretive's practice of fraudulently inflating its base and incentive fees began before its initial public offering. CW1 observed the practices as early as 2007 and believes that they became pervasive sometime in 2009. According to CW1, Accretive's Vice President of Revenue Cycle Operations (and CW1's boss) quit around December 2009 in part due to these problems.

According to CW1, two to three years into their managed service contracts, Accretive's customers began to notice that they were not seeing the benefits that they were expecting; taking into account the fees they paid to Accretive, their net revenue yields and revenue cycle operation costs were similar to what they had been before enlisting Accretive's services. Customers began to dispute Accretive's fee calculations two to three years after the practice of charging inflated fees began in 2009 and account receivables suffered as a result.

2.    Confidential Witness 2

Confidential Witness 2 (CW2) was Accretive's Revenue Cycle Manager in Birmingham, Alabama from April 2007 through April 2012. According to CW2, Accretive overstated net revenue yield improvements by manipulating which hospital departments and services would be included in the calculations, thus inflating incentive fees. CW2 stated that if a certain department or service typically had lower collection rates than others, Accretive would use some

pretext to exclude that department or service from its calculations. For example, Accretive might arbitrarily exclude a hospital's cardiology department because it would negatively impact net revenue yield, but include a different department that had a positive expected impact.

3.     Confidential Witness 3

Confidential Witness 3 (CW3) was Accretive's Cost Management Manager from April 2006 through May 2010. CW1 and CW3 both stated that Accretive billed customers and recognized revenue for the entire calculated net revenue yield increase, regardless of what portion of the increase was attributable to Accretive's services. According to CW3, Accretive did not have customer approval to do so.

CW3 stated that when Accretive had to mask that it overbilled its clients, it could give back the inflated fee amount by calculating a lower incentive fee in a subsequent quarter. In this way, future net revenue yield growth could cover up the "givebacks," and the company could manage its quarterly revenue and earnings.

4.     Material Misrepresentations and Omissions

Pressure Controls identifies five groups of statements that it believes contained materially false or misleading information or material omissions because (1) Accretive improperly recognized revenue under certain managed service contracts, thereby overstating revenue and earnings; (2) the financial statements were not prepared in accordance with generally accepted accounting principles; (3) Accretive failed to disclose that it lacked adequate internal and financial controls; (4) Accretive failed to disclose that it was systematically inflating the base and incentive fees that it charged its customers; and, for some of those statements, Accretive failed to disclose that its customers were increasingly disputing Accretive's fee calculations:

- Accretive's materials filed in connection with its May 20, 2010 initial public offering;

- Accretive's materials filed in connection with its March 25, 2011 secondary public offering;

- Press releases attached to Form 8-Ks reporting Accretive's quarterly financial results dated August 12, 2010; November 11, 2010; March 2, 2011; May 11, 2011; August 10, 2011; November 9, 2011; February 29, 2012; May 9, 2012; August 8, 2012; and November 7, 2012;

- Form 10-Qs stating Accretive's quarterly financial results dated August 13, 2010; November 12, 2010; May 12, 2011; August 12, 2011; November 10, 2011; May 9, 2012; August 9, 2012; and November 8, 2012; and

- Form 10-Ks stating Accretive's quarterly and annual financial results dated March 18, 2011, and February 29, 2012.

## II. LEGAL STANDARDS

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of the motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

Allegations of fraud are subject to a heightened pleading standard. Fed. R. Civ. P. 9(b). This means the plaintiff must, at a minimum, provide the time, place, and content of the alleged false representations, the method by which the representations were communicated, and the identities of the parties to those representations. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) ("[T]he plaintiff must allege the who, what, when, where, and how of the alleged fraud." (internal quotation marks omitted)).

"Pursuant to the PSLRA, securities fraud complaints must also be able to: (1) specify each misleading statement; (2) set forth the facts on which a belief that a statement is misleading is formed; (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter; and (4) prove loss causation." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011); *see* 15 U.S.C. §78u-4(b)(1)-(2). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (footnote omitted).

### III. ANALYSIS

Defendants argue that the amended complaint should be dismissed for improper "puzzle pleading." The Seventh Circuit has never used the term, but several district courts in this circuit have dismissed complaints for failure to satisfy the PSLRA's pleading standards "when it quotes the defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph." *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at *4 (N.D. Ill. June 16, 2014); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (affirming dismissal of a complaint

8

consisting "in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in [a previous paragraph] and the factual detail contained throughout this complaint'").

Puzzle pleading is problematic "because it requires the Court and the defendant to piece together exactly which statements Plaintiffs are challenging and what allegations contradict those statements." *Alizadeh*, 2014 WL 2726676, at *5. This can complicate the court's task and increase discovery costs. In *Lauria v. Biosante Pharmaceuticals, Inc.*, 968 F. Supp. 2d 951 (N.D. Ill. 2013), this court held that a complaint with large blocks of text from the defendant's public filings and press releases constituted a puzzle pleading, and that "the court cannot ascertain which statements were allegedly misleading, the reason or reasons why each statement was misleading, and whether the plaintiffs have sufficiently alleged facts creating a strong inference of scienter." *Lauria*, 968 F. Supp. 2d at 952. The court dismissed the complaint for failure to "state an understandable claim of fraud under Rule 9(b) or the PSLRA." *Id.* at 958.

Like the complaint in *Lauria*, the amended complaint here contains long block quotes from Accretive's filings with the SEC and does not identify which statements, in particular, are false. Instead, the amended complaint's section titled "Defendants' Material Misrepresentations and Omissions During the Class Period" quotes from Accretive's filings each quarter followed by the same boilerplate, repeated twelve times:

> The statements made in [the filings described in the preceding paragraphs], alleged above, were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, for the following reasons: (1) the Company had improperly recognized revenue under certain managed service contracts, thereby materially overstating its reported net services revenue and earnings in [the given quarter or fiscal year]; (2) the Company's [quarterly or annual] financial statements were not prepared in accordance with

GAAP; (3) the Company failed to disclose that it lacked adequate internal and financial controls; and (4) the Company failed to disclose that it was systematically inflating the base and incentive fees that it was charging its customers.

(Am. Compl. ¶¶ 61, 65, 68, 72, 77, 80, 83, 86, 91, 94, 97, 100).  In several instances, the complaint adds one more item to the numbered list:

> . . . and (5) the Company failed to disclose that its customers were increasingly disputing its fee calculations.

(Am. Compl. ¶¶ 91, 94, 97, 100).

Another court in this district described the problems that arise when the court is faced with such complaint allegations:

> The net effect of the pleading's format is to leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading.  Even this activity might be tolerable if the statements themselves were clearly identified, but . . . they are not.  Rather, it is frequently difficult to discern where the supposedly challenged statements end and the context or characterization [of the statements begins].

*Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012).

The defendants' memorandum in support of its motion to dismiss presents a compelling case that the amended complaint should be dismissed on puzzle pleading grounds for failure to satisfy the PSLRA's pleading requirements.  But the plaintiff's opposition is limited to a short paragraph in a footnote that does not address the merits of the argument:

> The complaint contains six large block quotes of statements in Accretive's SEC filings regarding revenue recognition (¶¶59-60, 71, 75-76, 89), which Plaintiff alleges were misleading because they failed to disclose the company's improper revenue recognition practices.  If these allegations are a "puzzle," as defendants assert (Defs. Br. at 14), then they are like a twelve-piece jigsaw given to toddlers.

(Pls.' Br. 4 n.2, ECF No. 61.)  This argument is insufficient.  "The salient point is that the court cannot ascertain which allegations are meant to match up with the [quoted] portions of the

complaint." *Lauria*, 968 F. Supp. 2d at 957. The court concludes that the amended complaint must be dismissed for failure to satisfy the PSLRA's pleading requirements.

Defendants ask the court to dismiss the complaint with prejudice. As was the practice in other cases involving dismissal on puzzle pleading grounds, this court declines to do so. "It is conceivable that the plaintiffs could correct the defects identified in this order by amending their complaint. Accordingly, in an exercise of its discretion, the court will afford the plaintiffs one [additional] opportunity to amend." *Lauria*, 968 F. Supp. 2d at 959 (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 698 (7th Cir. 2008)); *accord, e.g.*, *Conlee*, 2012 WL 3042498, at *5 ("[W]here a complaint contains puzzle pleading, courts have recommended that Plaintiff should be required to streamline and organize the complaint before allowing it to serve as the document controlling discovery. For this reason, Lead Plaintiff is given one additional opportunity to make his allegations with particularity."); *Alizadeh*, 2014 WL 2726676, at *6 ("The Court affords Plaintiffs another opportunity to amend the Amended Complaint in order to comply with all applicable pleading standards.").

## IV. CONCLUSION

For the reasons stated above, the defendants' motion to dismiss the amended complaint is granted. The amended complaint is dismissed without prejudice. Plaintiff may file an amended complaint within 28 days of the date of this order.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   September 25, 2014

11